Ralph DUONNOLO, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted Sept. 15, 1978.
Decided Dec. 28, 1978.

J. Dallas Winslow, Jr., Chief Deputy Public Defender, and Richard E. Fairbanks, Jr., Asst. Public Defender, Wilmington, for defendant below, appellant.

Michael F. Foster, Deputy Atty. Gen., Wilmington, for plaintiff below, appellee.

Before HERRMANN, C. J., DUFFY and McNEILLY, JJ.

McNEILLY, Justice:

Defendant, Ralph Duonnolo, appeals his Superior Court jury convictions of murder in the first degree and possession of a deadly weapon during the commission of a felony, asserting errors of the Trial Judge by: admitting inflammatory, irrelevant and prejudicial testimony of events occurring shortly before the murder; failing to instruct the jury on the law of extreme emotional distress; requiring defendant's wife to testify; permitting defendant to be viewed by the jury panel in handcuffs; admitting an empty pistol holder into evidence, it being irrelevant to a murder by stabbing; admitting evidence unlawfully obtained as a result of illegal seizure of defendant's automobile; and permitting testimony of defendant's refusal to take a lie detector test. Finding no error in the Trial Judge's failure to instruct the jury on the law of extreme emotional distress and no merit to defendant's other contentions, we affirm.

I

The victim, Rochelle Annette Van Kellenburg, also known as Rochelle Kelly, (Mrs. Kelly), died of multiple stab wounds inflicted by defendant.

The focal point of this rather complex series of events is the Turf Club on Route 40 in Bear, Delaware, and the arrival there, of Mrs. Kelly at approximately 12:35 A.M. to rendezvous with a Mr. Henderson, manager of the club. Upon her arrival, Mrs. Kelly knocked on the back door asking the club cook to tell Mr. Henderson she was outside waiting for him. Mr. Henderson went to the parking lot to join Mrs. Kelly, but she was not there, although he found her car, with the keys in the ignition, and

her handbag and sweater on the front seat. At 1:03 A.M. Mr. Henderson called the police.

Shifting now to the defendant, he was at home in Richardson Park at approximately 10:30 P.M. the same night, when he decided to go deer poaching in Kirkwood, near Delaware City, and the farm of Mrs. Duonnolo's aunt. He left home wearing hunting clothes and carrying a hunting knife and a pistol; he had a shotgun in the back of his station wagon. Proceeding in a westerly direction on Route 40, defendant observed a young man and a girl hitchhiking. He picked them up at approximately 12:15 A.M. and took them to the area of Glasgow, Delaware, made a U-turn, and proceeded easterly in the direction of Bear. According to defendant, he stopped at the package store of the Turf Club at approximately 12:30 A.M. to buy wine. Leaving there he continued on his way to a wooded area in Kirkwood, where he had often hunted in the past. He claims that on the way he picked up three more hitchhikers: two men and a woman he identified as the victim. He further contends that he was knocked unconscious. The next thing he knew, he awoke to find the victim dead on top of him, saw the other two hitchhikers apparently digging a grave, and watched them flee when a flashing light appeared on the railroad overpass close to where they were digging. Defendant stated he immediately left the scene in his station wagon, went home and had his wife call the police to report the murder and to request an investigation into the beating he had sustained. The police attempted to find the victim's body following defendant's directions, but being unable to do so they requested defendant's assistance. He took them to the location of the victim's body, estimated as being approximately a city block or more from the farm of Mrs. Duonnolo's aunt. Medical testimony revealed that the victim had been stabbed six times on the right side of the chest, six times on the left side of the chest and three times in the back. Additionally, there were multiple contusions in the area of the victim's head, neck, jaw and left forearm.

## II

■ Defendant first objects to the testimony of a State police officer based on his recollection from notes made by him during the taking of an oral statement from the first hitchhiker, X. Edwards. In reply to questioning of the prosecutor, the officer stated:

"Yes, I spoke to Mr. Edwards, X. Edwards. He related that he was picked up by Mr. Duonnolo while he was thumbing on Route 40, and that he was with his girl friend, it was approximately 12:15 in the morning on Sunday, the 5th; that as he entered the car, Mr. Duonnolo pointed a firearm at him, at which time he became very frightened and started telling Duonnolo that he was his cousin in hopes that he would calm down. At the time Duonnolo, realizing that Edwards was his cousin, then said 'That's right. I used to put diapers on you.'"

\*   \*   \*   \*   \*   \*

"A They were driving—X. Edwards requested a ride home. They were going westbound on Route 40 towards Maryland, at which time they observed or the defendant, Mr. Duonnolo, observed a black male hitchhiking on Route 40. The black male had—was carrying bags and Mr. Duonnolo related that he was going to drop them off and come back and kill him a nigger, was his terms used."

\*   \*   \*   \*   \*   \*

"A Edwards related that he was driving very erratic and appeared to be doing about 15 to 20 miles an hour. He also related at one time during the course of their traveling down the road Mr. Duonnolo fired this cap and ball type of pistol out the window."

Defendant's objection is based upon relevancy and the prejudicial impact upon the jury hearing the racially inflammatory remark attributed to defendant that he was going back and "kill him a nigger." We agree with the Trial Judge that the remark was **inflammatory and unfortunate. But**

we also agree that it was relevant to defendant's state of mind minutes before the homicide, as is the testimony of X. Edwards concerning defendant's intoxication, defendant's being upset, shooting a pistol out of the car window, pointing the same pistol at the witness entering the car, and stating that he ought to go back and shoot the black man they had seen hitchhiking. We also have corroboration of that testimony by Edwards' girl friend, plus her version of defendant's conduct and condition which, she stated, put her in fear of her own safety when defendant asked her something like "How would it feel to die?", and again interrupted her conversation by saying, "You better be quiet, little lady, you sound a lot like my wife and I wouldn't like to hurt you."

This being a case of murder in the first degree we turn to the pertinent statutory provisions and the commentaries thereon:

11 *Del.C.* § 636(a) reads as follows:

"A person is guilty of murder in the first degree when:

(a) He intentionally causes the death of another person;"

The pertinent part of the commentary on § 636 reads as follows:

"This section defines the most serious offense in this Criminal Code and makes it subject to extreme penalties, including the death penalty and life imprisonment without benefit of parole. Subsection (1) covers intentional killing. This has traditionally been regarded as the most aggravated of crimes because the defendant has disregarded unquestioned social values and the threat of severe punishment. Premeditation or deliberation are not required, nor is any showing of 'malice.' The sole question is whether it was the defendant's 'conscious object' to kill his victim. The defendant's state of mind will, of course, often have to be proved by circumstantial evidence, and this Criminal Code permits such proof. Section 307 specifically allows the State to get its case to the jury upon proof that a reasonable man, knowing the facts known to the defendant, would have had the requi-

site intention, as evidenced by the acts which he did."

11 *Del.C.* § 307 provides:

"(a) The defendant's intention, recklessness, knowledge, or belief at the time of the offense for which he is charged may be inferred by the jury from the circumstances surrounding the act he is alleged to have done. In making the inference permitted by this section, the jury may consider whether a reasonable man in the defendant's circumstances at the time of the offense would have had or lacked the requisite intention, recklessness, knowledge, or belief.

(b) When the defendant's intention, recklessness, knowledge, or belief is an element of an offense, it is sufficient to establish a prima facie case for the State to prove circumstances surrounding the act which the defendant is alleged to have done from which a reasonable juror might infer that the defendant's intention, recklessness, knowledge, or belief was of the sort required for commission of the offense."

The pertinent part of the commentary on § 307 reads as follows:

"One of the most important underlying premises of this Criminal Code is that criminal guilt ought to turn on the subjective criminality of the accused."

\*    \*    \*    \*    \*    \*

When a man's intention must be proved, for example, it would appear to be impossible for the State, without calling the defendant to the witness stand, to prove his intention, unless he has made a written memorandum of it or has told another person. Even the common law was faced with this problem, and dealt with it by the presumption that man is presumed to intend the natural and probable consequences of his acts.

That presumption is preserved, and in addition § 307 permits the State to get its case to the jury on the basis of what would have been the state of mind of a reasonable man under the circumstances known to the accused. This may be

shown not only by direct proof, but also by such inference as may be reasonably drawn from the evidence adduced. The jury is not relieved of its job of determining whether, in any case, the defendant himself had the requisite mental state. The jury must use the 'reasonable man' evidence as a way of reaching the defendant's own culpability. Section 307 permits the jury to infer the requisite culpability from all of the facts of the case, by considering what a reasonable man, in the defendant's circumstances at the time of the offense, would have intended. Moreover, subsection (2) permits the State to make out a prima facie case of murder, for example, despite lack of direct proof of intention to kill, if it has proved circumstances from which a reasonable juror might infer the requisite intention."

Defendant's state of mind being of vital importance to the prosecution of this case, his first allegation of error is without merit.

### III

■ Defendant contends the Trial Judge failed to instruct the jury on the law of extreme emotional distress under this Court's decision in *Fuentes v. State,* Del. Supr., 349 A.2d 1 (1975). The defendant bases his contention on the testimony of Dr. Galicano Inguito, the Medical Examiner performing the autopsy. Dr. Inguito testified about the nature and extent of the wounds leading one to the undeniable conclusion of a violent and frenzied struggle.

The defense in this case was a denial of any involvement. No effort was made on the part of defendant to produce evidence of emotional distress, and the Medical Examiner's testimony neither triggered the State's burden of disproving it nor the Court's obligation of instructing on it. We find no error on this point.

### IV

■ Defendant contends the Trial Judge erred by requiring his wife, Patti Duonnolo, to testify about her observations of defendant's appearance and conduct before and after the homicide.

Mrs. Duonnolo objected to testifying against her husband based upon marital privilege and her privilege against self-incrimination. The Trial Judge ruled that she would not be required to testify concerning confidential communications with her husband based upon the marital relation. The Trial Judge also granted Mrs. Duonnolo criminal immunity, but ordered that she must testify about observations made of defendant before and after the homicide.

It is statutory law in Delaware that "a wife or husband may testify against each other in criminal cases in any court of this State." 11 *Del.C.* § 3502. Noting the removal of the common law disqualification of husband and wife to testify against each other, the Delaware Courts have held that the statute does not remove the bar of the common law against testimony of husband and wife as to communications between them based on the marital relation, but that the husband or wife may be compelled to testify to any facts the knowledge of which was acquired independently of their marital relation. *State v. Lynch,* Del.O. & T., 128 A. 565 (1925). See *Mole v. State,* Del.Supr., 396 A.2d 153 (1978).

Even assuming, as defendant suggests, that observations are communications which rise to the same level as the spoken word, and that the observations are made as a result of the private and confidential nature of the marital relation between husband and wife, we are satisfied that defendant in this case waived any assertable marital privilege by his appearance and conduct before and after the homicide that were apparent to third persons. Before the homicide, defendant's appearance and conduct was viewed by the hitchhikers. After the homicide, he requested the police officers, who testified as to his appearance and conduct, to come to his home for the purpose of seeing and interviewing him. *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

### V

■ Defendant contends the Court erred by not dismissing the jury panel which

viewed the defendant being take to the restroom during the selecting of trial jurors, and returned to the courtroom in handcuffs. There is no evidence of prejudice to the defendant in the record. The defendant was seen only briefly by the panel, two jurors who could have observed defendant are known to have been excused, and, additionally, the Court immediately ordered that the defendant not be taken to and from the courtroom in handcuffs until the jury selection was completed and the jurors sequestered. We find no error under this Court's decision relating to the viewing of handcuffed defendants in *Brookins v. State,* Del.Supr., 354 A.2d 422 (1976).

## VI

■ Defendant claims error by the Trial Court in admitting an empty pistol holster into evidence, it being irrelevant to a murder by stabbing. This claim of error has no merit.

The holster was identified by defendant's wife as the one worn by defendant with a pistol in it when he left home on the night in question. Defendant admitting having a pistol and holster with him that night; the hitchhikers testified concerning use of the pistol; and defendant appeared at home after the crime without pistol and holster, the holster being found in the bloody back seat of his car; the pistol never appeared. We consider the holster as being merely another link in the chin of circumstantial evidence leading to defendant's conviction.

## VII

■ Defendant contends that the impoundment of his car was an illegal seizure, therefore the evidence produced by a search of the vehicle's interior was illegal although made pursuant to a valid search warrant.[1] We disagree.

Defendant relies on the line of Fourth Amendment automobile cases holding that a search and seizure of an automobile without a warrant must be based on probable cause and must be necessitated by exigent circumstances. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). That is not our case. In the first place the evidence seized and objected to was seized after a search made pursuant to a search warrant, the validity of which is not attacked. Additionally, we view the line of cases cited by defendant as applying a rule of reason to an automobile's seizure but exigent circumstances to an automobile's search and seizure of contraband articles found as a result. *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). In *Opperman,* police officers impounded a motorist's car for multiple parking violations. During a routine inventory of the car's contents the police found marijuana in the unlocked glove compartment. The United States Supreme Court held this routine proper procedure in the interests of public safety, and as part of a "community caretaking function."

In this case the police officers concluded that they had no protective interest in the station wagon's contents since the car was adequately secured to prevent its removal, the destruction of evidence, or theft, and further, that it would be unreasonable to conduct a search in the station wagon without a warrant because of the absence of any exigent circumstances. The police, however, did have an interest in securing physically and impounding the Duonnolo station wagon. After summoning the police to his home Mr. Duonnolo gave the police sufficient information for them to have probable cause to believe the station wagon had been used during the commission of the murder.

Defendant's bloody clothing, the apparent blood on the outside of the station wagon, and his inference of the two men hitchhikers having committed the murder are more

---

1. Although not raised either in the briefing or oral argument, we note without further comment 11 *Del.C.* § 2322 in its pertinent part which reads as follows:

"Whenever any vehicle, as defined in this subchapter, has been used in, or in connec-

tion with the commission of any felony . . . it shall forthwith be seized and taken into custody by the peace officer or officers having knowledge of the facts of such use."

than sufficient to justify the police officers' action. It was the police officers' duty to guard the automobile so that it could not be tampered with, nor moved and the evidence destroyed.

## VIII

The last contention is that the Court erred by permitting a witness to testify as to the reason defendant declined to take a lie detector test. The State and defendant agree that the results of polygraph testing are generally inadmissible, absent agreement of the parties. Testimony that an accused refused to take a polygraph test, without more, amounts to impermissible comment upon the accused's Fifth Amendment right to remain silent. We view the testimony attacked in this case, however, not as being offered because defendant would not take a polygraph test, but because of the voluntary incriminating statement made by him to a fellow prisoner which only incidentally concerned the polygraph testing.[2]

We find no merit in this contention. AFFIRMED.

---

2. The fellow prisoner's testimony in its pertinent part is:

"Q. When you indicated to [defendant] that there were some problems with the story, what did he do?

A. He said, "Well, I will have to think about that and do something to correct it," and about that time I said—he said, "Well, they asked me to take a lie detector test," the state police asked him to take a lie detector test, and I said, "Why didn't you do it? That would have cleared you right there, probably." He said, "What do you think, I want to hang myself."