**William Mark McKINNEY, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: March 15, 1983.*

Decided: July 20, 1983.

* This case was reargued on March 15, 1983. The prior opinion, issued on December 8, 1982, is hereby withdrawn.

Samuel J. Frabizzio, Neal A. Phillips (argued), Wilmington, for appellant.

M. Jane Brady (argued), Deputy Atty. Gen., Wilmington, for appellee.

Before HERRMANN, C.J., McNEILLY and MOORE, JJ.

HERRMANN, Chief Justice:

The defendant, William Mark McKinney, appeals his conviction of Murder in the First Degree [11 *Del.C.* § 636(a)(1)] on the grounds that the Superior Court committed reversible error (1) in admitting the testimony of a prison cellmate of the defendant; (2) in refusing to admit testimony intended to impeach the cellmate; (3) in admitting the testimony of a clinical psychologist intended to corroborate the cellmate; and (4) in refusing to allow expert witness testimony challenging the validity of Federal Bureau of Investigation hair-comparison tests.

I.

The following facts are undisputed:

On August 4, 1980, Georgia Patterson ("victim") was last seen with the defendant in the defendant's automobile at several different locations, including the Airport Liquor Store and a nearby service station. The victim never returned home and 3 days later her nude, partially decomposed body was found concealed at a dump-site at the Airport. An autopsy showed that the cause of death was cranial and cerebral injuries, including a fractured jaw, caused by a blunt instrument. There were numerous defensive wounds on the arms and legs of the victim. Numerous items of evidence from the area surrounding the victim's body were seized. In addition, samples of the victim's head and pubic hairs were obtained.

During pre-trial interview, a police officer observed a scratch on the defendant's neck and a bandage on his left hand. The defendant stated that he had suffered the scratch in an unknown way at the beach a few days earlier, and had injured his finger when he struck the windshield of his vehicle with his fist. In addition, he told the police officer that he was with the victim on August 4; that they were drinking Michelob beer as they drove around; that he had left the victim at a store at approximately 9:45 p.m.

As a result of these statements, corroborative evidence at the scene of the crime, and observation by the police of the defend-

ant's injuries, search warrants were obtained for the defendant's automobile and house. The police matched evidence seized from the car and house with evidence at the scene of the crime and charged the defendant with Murder in the First Degree.

## II.

At trial, State's witness Ronald Shaw, the cellmate of the defendant at the Delaware Correctional Center, testified that the defendant twice mentioned the Murder charge against him and the evidence collected by the State, each time in the presence of other inmates and each time denying any involvement. (Tr.F. 48–49).[1] Shaw testified further, however, that, when alone with him, the defendant later told him the following:

"A He said, 'I wish I didn't do it. You know, I shouldn'ta killed her. I had no reason to.'

Q You certain he said that?

A Yes, sir.

Q What else did he say?

A He said, 'I know they're going to find me guilty.' You know, they got the fingerprints from the beer cans, blood on his sneakers, the tire tracks. 'And that's where, you know,' he said, 'I always go back and party.'

Q He said what?

A That's where he always goes back and parties at, back where they found the body at, where they go back to drink beer and all.

Q So then he said that he knew the area—

A Right.

Q —where the body was found that time?

A Right.

Q Did he indicate to you why the murder happened?

A No.

Q Did he indicate to you how he did it?

A With a pipe.

Q I beg your pardon?

A With a pipe.

Q A pipe?

A Right.

Q Did he indicate where or how he struck the victim with that pipe?

A In the head. In the ears. In the ear.

Q Did he say anything about the appearance of the victim?

A Just he said the body was so messed up you couldn't—the only way you could identify it was through her teeth." (Tr.F. 50–51).

Shaw further testified that the defendant formulated and executed, in Shaw's presence, a plan to stage a pretended mental illness and suicide attempt while in prison awaiting trial. *See* Tr.F. 52–59. The clear purpose of Shaw's testimony was to demonstrate the defendant's consciousness of guilt. The defendant objected to admission of the testimony on the grounds that (1) the State had not laid the necessary foundation, and (2) the testimony was unduly prejudicial. The Trial Court overruled the objection and admitted the testimony.

The defendant subsequently attempted to impeach Shaw by proffering the testimony of Edward Pankowski, a former state prosecutor and then an assistant public defender. Pankowski was offered to testify, as an expert, to the tendency of inmates charged with multiple crimes, like Shaw, to come forward with purported confessions of other inmates. The Court rejected the proffer, ruling that the testimony would be irrelevant because Pankowski had no specific or personal knowledge concerning either the defendant or Shaw and would, therefore, testify merely to generalities.

The State's witness, Dr. Como Galliani, was a clinical psychologist who had exam-

---

1. "Tr." refers to the trial transcript in this case and will be accompanied by the pertinent volume and pagination. Such record identification will be used for especially significant elements only.

ined the defendant, at the request of defense counsel and by Order of the Court, for competency to stand trial. He testified that the defendant was malingering during the period of alleged mental illness. The defendant objected on the ground that the opinions of Dr. Galliani were privileged both under 24 *Del.C.* § 3518, the psychologist-client privilege Statute then in effect, and Delaware Uniform Rule of Evidence (hereinafter "D.R.E.") 503. The Court admitted the testimony.

The defendant called Dr. Charles A. Garber as an expert to discredit the testimony of an F.B.I. agent, a witness for the State, as to hair comparisons. The Trial Court limited Dr. Garber's testimony to comment upon general variations in hair; he was not permitted to testify as to the validity of the F.B.I. test.

The defendant presented an alibi defense. The jury found him guilty as charged and the Court sentenced him to life imprisonment, without probation or parole, under 11 *Del.C.* § 4209(d)(3).[2]

### III.

The defendant contends that the Trial Court improperly admitted the testimony of Shaw, the defendant's cellmate, because the State failed to adduce, as the foundation for Shaw's testimony, evidence that the defendant was trying to escape liability for the crime. He further argues that because his own credibility was crucial and Shaw's testimony showed that the defendant was unstable, admission of the testimony was unfairly prejudicial. We disagree with both contentions.

 Under a plea of not guilty, any conduct of the defendant subsequent to the commission of the crime, that tends to show consciousness of guilt, is relevant. *See Tice v. State,* Del.Supr., 382 A.2d 231, 233 (1977). Shaw's testimony tended to show that the defendant's purpose in feigning mental illness and a suicide attempt was to avoid responsibility. The testimony, therefore, was relevant to the issue of the defendant's consciousness of guilt.

And Shaw's testimony was not unfairly prejudicial in that it demonstrated the defendant's instability. On the contrary, the testimony tended to reveal shrewd and deliberate actions. Particularly noteworthy is Shaw's recounting of the defendant's elaborate and calm planning of the alleged suicide attempt. Tr.F. 52–59.

### IV.

As to the Trial Court's rejection of the testimony of Pankowski, the defendant contends that, because the credibility of a witness is always relevant, failure to allow the impeachment testimony was unduly prejudicial.

 The Trial Court's rejection of the testimony was not error. Pankowski's testimony related solely to generalities and was, therefore, irrelevant and inadmissible under D.R.E. 402.[3] Moreover, as a matter of general trial practice, defense counsel should not have proffered Pankowski as an "expert" witness under the circumstances and Pankowski should not have been willing to participate in such tactics. Under D.R.E. 702,[4] a witness qualifies as an expert

---

**2.** 11 *Del.C.* § 4209(d)(3) provides:

"§ 4209. Punishment, procedure for determining punishment, review of punishment and method of punishment for first-degree murder.

 * * * * * *

"*(d) Determination of sentence.—*

"(3) If the jury, or judge when applicable, cannot unanimously find that at least 1 statutory aggravating circumstance exists and cannot unanimously recommend death, the Court shall sentence the defendant to life

imprisonment without benefit of probation or parole.

* * *."

**3.** D.R.E. 402 provides:

"All relevant evidence is admissible, except as otherwise provided by statute or by these rules or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible."

**4.** D.R.E. 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to under-

by his "knowledge, skill, experience, training, or education." Once qualified, and "if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness * * * may testify thereto in the form of opinion or otherwise." On the record before us, the sole experience of Pankowski was his general experience, as a deputy attorney general and assistant public defender, with inmates at the Delaware Correctional Center. We do not view as insignificant the value of general experience gained in either or both of these positions. Without more, however, Pankowski's general experience and knowledge derived therefrom did not begin to rise to the level of the "specialized knowledge" sufficient to assist the jury to determine a fact in issue, as required by D.R.E. 702. Compare *Peters v. Gelb*, Del.Supr., 314 A.2d 901 (1974); *Wilmington Medical Center, Inc. v. Redden*, Del.Supr., 312 A.2d 625 (1973). We view the proffer and Pankowski's willingness to testify as overzealous and ill-advised.

## V.

We come to the most significant ground of this appeal: the testimony of Dr. Galliani that the defendant was malingering during the period of alleged mental illness. Defense counsel had requested, and the Trial Court had ordered, psychological examination to determine the defendant's competency to stand trial after his allegedly feigned suicide attempt. The defendant contends that the State improperly called Dr. Galliani as its witness to corroborate the testimony of Shaw. The argument is that testimony by Dr. Galliani violated (1) the defendant's evidentiary psychologist/client privilege under 24 *Del.C.* § 3518 and D.R.E. 503; and (2) the defendant's Fifth Amendment privilege against compelled self-incrimination.

stand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or educa-

## A.

We turn first to the claimed violation of the evidentiary privilege.

As a threshold matter, we note that § 3518 did not govern the admissibility of Dr. Galliani's testimony at the December, 1980 trial. The Statute, while not expressly repealed until June 30, 1981, was superseded by D.R.E. 503 on July 1, 1980 when, by Order of this Court, the Uniform Rules of Evidence went into effect for all courts in Delaware. *In Re Adoption of the Delaware Rules of Evidence*, 16 *Del.C.* at 491–92 (1980).

The issue is, therefore, whether admission of Dr. Galliani's testimony violated D.R.E. 503. That Rule provides in pertinent part:

"RULE 503. PHYSICIAN AND PSYCHOTHERAPIST-PATIENT PRIVILEGE.

\* \* \* \* \* \*

"(b) General Rule of Privilege. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

\* \* \* \* \* \*

"(d) Exceptions.

\* \* \* \* \* \*

"(2) Examination by Order of Court. If the court orders an examination of the physical, mental or emotional condition of a patient, whether a party or a witness, *communications* made in the course thereof are *not privileged* under this rule *with respect to the particular purpose for which the examination is ordered unless the court orders otherwise.*

tion may testify thereto in the form of an opinion or otherwise."

*"(3) Condition an Element of Claim or Defense.* There is *no privilege* under this rule as to a communication relevant to an issue of the physical, mental or emotional condition of the patient *in any proceeding in which he relies upon the condition as an element of his claim or defense* or, after the patient's death, in any proceeding in which any party relies upon the condition as an element of his claim or defense. * * *." (emphasis supplied)

As the clear language of the Rule provides, a patient privilege is afforded as a general rule; but there are carefully specified exceptions set forth in the Rule itself. Taking Exception (d)(3) first: the defendant did not rely upon his mental condition "as an element of his claim or defense." Therefore, Exception (d)(3) is inapplicable. Under Exception (d)(2), communications made during a Court-ordered examination are excepted from the privilege, but only "with respect to the particular purpose for which the examination is ordered." The Trial Court, in granting the defendant's request for the psychological examination, took great care to expressly and narrowly limit the purpose of the examination. The Order for the examination states in relevant part:

"... ORDERED that a psychiatric and psychological *examination* be conducted on William Mark McKinney *for the sole and singular purpose of determining his present competency to stand trial.*

FINALLY ORDERED that no member of the staff of the Delaware State Hospital, as part of the competency determination, shall ask, or require, any information concerning the defendant's alleged participation in the offenses for which he is presently charged." (emphasis supplied)

 The State, however, did not offer Dr. Galliani's testimony for the "particular purpose for which the examination was ordered," i.e., to establish competency to stand trial; rather, the testimony was clearly intended to corroborate Shaw's testimony regarding consciousness of guilt. It

follows that the admission of Dr. Galliani's testimony violated the defendant's D.R.E. 503 patient privilege.

We are convinced, however, that violation of the D.R.E. privilege, while error in this case, was harmless beyond a reasonable doubt because of the overwhelming evidence of guilt supporting the conviction manifest on the record of this case.

Our review of the record reveals the following: *Found at the crime scene were:*

"(1) a pair of men's undershorts containing a pubic hair microscopically similar to the pubic hair of the defendant (Tr.G. 96, 184);

"(2) a tire iron or 'lug wrench,' which at least two persons testified to having seen the defendant keep under the front seat of his car (Tr.G. 48, 195);

"(3) a pair of men's socks, one of which contained hairs microscopically similar to the head hairs of both the victim and the defendant (Tr.G. 193–94);

"(4) a box of 'Rosebud' brand wooden matches (Tr.F. 192);

"(5) several whole and broken Michelob beer bottles, with labels torn in a manner associated with the defendant (Tr.G. 82); and

"(6) a piece of speaker wire entangled in the victim's hair (Tr.G. 200)."

*Found in or on the defendant's car were the following:*

"(1) a bloodstained gearshift console containing hairs microscopically similar to hair of the victim (Tr.G. 208–09);

"(2) bloodstained dashboard, stereo speaker, and rear seat (Tr.G. 83–86);

"(3) a bloodstained exterior chrome strip (Tr.G. 87);

"(4) speaker wire similar in size, color and manufacture to that found at the scene (Tr.D. 61); and

"(5) a bloodstained right front tire to which was affixed hair similar to the victim's (Tr.G. 208–09).

*And from the house were seized:*

"(1) underwear and socks resembling those found at the scene;

"(2) a box of 'Rosebud' matches (Tr.C. 335); and

"(3) bloodstained sneakers matching the description of the shoes worn by the defendant on the night of the crime (Tr.D. 8).

Clear on the record, too, is strong evidence of the defendant's guilt consisting of the inconsistencies manifest in his testimony regarding his injuries [5] and the condition of his automobile.[6]

In sum, we are satisfied, upon a thorough examination of the record, that, in light of the overwhelming weight of the evidence of the defendant's guilt, there is no reasonable possibility that the erroneous admission of the testimony of Dr. Galliani contributed significantly to the conviction of the defendant. Thus, we are satisfied that it was harmless error beyond a reasonable doubt. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### B.

Turning to the defendant's constitutional challenge: the defendant contends that *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) and *Battie v. Estelle,* 5th Cir., 655 F.2d 692 (1981) required *Miranda*-type warnings at the time of Dr. Galliani's examination.

■ Assuming, without deciding, that the defendant was entitled to *Miranda* warnings in connection with an examination which defense counsel requested, and that it was error to admit Dr. Galliani's testimony in the absence thereof, we arrive at the same conclusion reached upon the finding of error under D.R.E. 503: We are satisfied that, in light of the overwhelming

weight of the evidence of the defendant's guilt as hereinabove set out, the admission of Dr. Galliani's testimony was harmless error beyond a reasonable doubt. *Harrington v. California,* supra; *Chapman v. California,* supra.

### VI.

■ Subsequent to this Court's granting the defendant's Motion for Reargument, the defendant raised a Sixth Amendment claim for the first time during rehearing on the Motion. Relying upon *United States v. Alvarez,* 3d Cir., 519 F.2d 1036 (1976), the defendant argues that the Trial Court's admission of Dr. Galliani's testimony denied him his right to effective assistance of counsel since he did not intend to call Dr. Galliani as a witness or otherwise raise at trial the issue of his mental condition.

The Sixth Amendment issue was not raised anywhere in this case until the very last stage. Accordingly, we decline to consider it now. Supreme Court Rule 8; *Davis v. State,* Del.Supr., 400 A.2d 292, 299 (1979).

### VII.

■ Finally, as to the defendant's contention regarding the F.B.I. hair-comparison tests: defense witness Dr. Garber, it is argued, qualified as an expert to testify as to the validity of the test. The defendant concludes generally that the Court's improper limiting of Dr. Garber's testimony to a discussion of the general difficulty in making hair comparisons unduly prejudiced the defendant. We find this position untenable.

The record shows clearly that Dr. Garber had never done hair comparisons and had no training in that field. His lack of experience and knowledge regarding hair com-

---

**5.** Compare Tr.F. 252 (defendant testified scratch on neck from beach weekend) with Tr.E. 42 (companion at beach saw no scratch). *See* Tr.F. 254 (defendant initially told police his lacerated finger resulted from smashing his windshield in a fit of anger; later he said it resulted from a fight with a hitchhiker).

**6.** According to the defendant, his finger dripped blood on the console and dashboard when he reached for his cigarettes after the fight with the hitchhiker (Tr.C. 238, 270); and on the rear seat when he reached for a beer (Tr.C. 243). He offered no explanation for the bloodstained stereo speaker, chrome strip, or tire with the victim's hair (Tr.C. 243–49).

parison thus required the limitation imposed. *See* D.R.E. 702.

*Reynolds v. State,* Del.Supr., 424 A.2d 6 (1980), involving fingerprint classification, is controlling. In *Reynolds,* this Court held that the Trial Judge did not abuse his discretion in limiting an expert witness' testimony to background information regarding fingerprint evidence when the witness had never actually classified fingerprints. Similarly here, Dr. Garber's inadequate experience and training in hair comparison compelled the limitation of the scope of his testimony. The Trial Court did not abuse its discretion in this case.

\* \* \*

There is no reversible error upon any ground of this appeal.

AFFIRMED.