Jose ARES, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 583, 2006.

Supreme Court of Delaware.

Submitted: Sept. 12, 2007.
Decided: Oct. 18, 2007.

Nicole M. Walker, Esquire, Office of the Public Defender, Wilmington, Delaware; for Appellant.

Gregory E. Smith, Esquire, Department of Justice, Wilmington, Delaware; for Appellee.

Before HOLLAND, BERGER and JACOBS, Justices.

JACOBS, Justice.

Jose Ares ("Ares"), the defendant-below appellant, appeals from a final judgment of conviction entered by the Superior Court. Ares was indicted on charges of (among other things) first-degree murder and attempted first-degree murder. A jury found Ares guilty of second-degree murder and assault in the first degree. On appeal, Ares claims that the Superior Court: (1) erred by admitting into evidence certain statements made by Ares during booking; and (2) abused its discretion and denied Ares his due process right to a fair trial by permitting Ares' wife to testify that, during the shootings, Ares directed a racial epithet at the deceased victim. We find that: (i) the admission of Ares' statements during booking, although obtained in violation of *Miranda*, was harmless error, and (ii) the admission of the racial epithet was not unfairly prejudicial, given the strong case against the defendant. We therefore affirm.

### FACTS

Ares met his second wife, Rose Corio ("Rose"), while both were employed at the Delaware State Hospital. Ares and Rose married on August 12, 2003. Within one month of their marriage, Ares and Rose purchased a house and moved out of the apartment they had been sharing. After the couple engaged in a serious fight in April 2005, the relationship progressively deteriorated to the point that Rose moved into the guest bedroom. On several occasions Ares accused Rose of infidelity. Rose denied being involved with anyone else, although she and Alvin Davis

("Davis"), who was also working at the hospital, had started spending time together and frequently talked on the telephone.

Ares and Rose worked different shifts at the hospital. On October 2, 2005, Rose returned home from work earlier than expected. Around 11:00 p.m. she received a call from Davis asking if he could come over to talk. Rose testified that when Davis arrived, they went into the guest bedroom, sat on the bed, talked, and checked the sports scores on television.

At approximately 11:20 p.m., Ares informed Margaret Wilson, his supervisor at the hospital, that he needed to take his break to fix a leak in one of his tires. He also agreed to buy coffee for two co-workers. Ares told Dr. Mechanik (a trial expert witness) that he (Ares) then realized that he had forgotten to bring his medication and went back home to retrieve it. Upon entering the house, Ares heard voices coming from the guest bedroom, and went upstairs to retrieve his gun. When Ares opened the door to the guest bedroom, Rose and Davis jumped to their feet. Ares started shouting and cursing and shot Davis. Rose testified that Davis fell to the floor and Ares leaned over the bed, pointed the gun down at Davis, and shot him again, stating "fucking nigger." Ares then shot Rose and left the room, after which he came back with a machete, struggled with Rose, called her a whore, and expressed his disbelief that she was "still calling that fucking nigger's name."

After leaving the room, Ares called 911 to report that he had just shot two people. He then called his supervisor at the hospital and informed her of the incident. Rose also called 911 from her cell phone and requested an ambulance. Davis died at the scene; Rose underwent surgery and survived.

When the Police arrived at the scene, Ares did not resist arrest. At the police station, Detective Smith took Ares to be processed, and informed the booking officer, Corporal Craft ("Craft"), that Ares had invoked his *Miranda* rights. Craft proceeded to obtain "pedigree" information from Ares, read him the charges and took his fingerprints. When Craft informed Ares of the gun possession charges, Ares responded that "he bought the gun at Miller's gun shop and . . . the gun never left the house."[1] During fingerprinting, Craft asked Ares whether he had any children. According to Craft, Ares responded that he had three children and then went on to say:

> [H]e didn't want to bring his family into all this. . . . [H]e knew his wife was having a relationship with someone and that he asked her not to bring it into the house . . . [H]e was suspicious that something was happening on this night because his wife had gotten home early from her shift . . . [H]e told his boss that he wanted to leave work to go get a cup of coffee. He went home, entered the house and heard noises . . . [H]e retrieved his gun, he went up to her room and saw them . . . [H]e went into the room just to scare them and that's when he saw them, and the gentleman lunged . . . at him and . . . he just started shooting.[2]

### ANALYSIS

### The Motion to Suppress Ares' Statements During Booking

 Ares first claims that the Superior Court erred by denying his motion to suppress Ares' statements to Craft. This

---

1. Hereinafter, "Statement # 1."

2. Hereinafter, "Statement # 2."

Court reviews a trial court's denial of a motion to suppress after an evidentiary hearing for abuse of discretion.[3] To the extent the claims of error implicate questions of law, this Court exercises *de novo* review.[4]

### *Was There a Violation of Miranda?*

■ Ares made two statements to Craft. The first was prompted by Craft enumerating the charges against Ares. The second statement was in response to Craft asking Ares whether he had any children. In our view, Craft's conduct during booking violated *Miranda*[5] because it constituted the functional equivalent of an interrogation and because Craft should have known that his actions were likely to elicit an incriminating statement from Ares.

### *Statement # 1*

After Craft enumerated the gun possession charges, Ares responded that he had a gun, stated where he had purchased it, and told Craft that he kept the gun in the house. We need not decide whether this statement (Statement # 1) was properly admitted into evidence, because (i) Statement # 1 was not specifically the subject of the oral suppression motion denied by the Superior Court, and (ii) the admissions were not "incriminating," since Ares never contested committing the crimes with the weapon described. However, Statement # 1 is relevant to the issue of whether Craft should have known that his question about Ares' children was likely to elicit an incriminating statement.

In *Tolson v. State*, this Court recently held that "enumerating the charges against [defendant], *without more*, was consistent with the booking process and [that] it was not foreseeable that the enumeration would elicit an incriminating response"[6] especially since the defendant had repeatedly demanded to know what the charges were. The instant facts, however, involve more than merely enumerating the charges. Ares had not asked what the charges against him were. It was Craft who initiated a conversation with Ares by reciting the charges. As Craft admitted, advising the defendant specifically about the charges was not standard procedure.[7] Craft then continued the conversation by asking Ares about his children without reissuing *Miranda* warnings, even though Craft was aware that reading one of the charges to Ares had already prompted Statement # 1. By continuing the conversation, Craft converted it into the functional equivalent of an interrogation.

### *Statement # 2*

The critical issue is whether under *Miranda*, Ares made Statement # 2 as a result of interrogation or its "functional equivalent," which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incrimina-

**3.** *Wien v. State*, 882 A.2d 183, at 188 (Del. 2005) (citing *McAllister v. State*, 807 A.2d 1119, 1122–23 (Del.2002)); *Woody v. State*, 765 A.2d 1257, 1261 (Del.2001).

**4.** *Downs v. State*, 570 A.2d 1142, 1144 (Del. 1990).

**5.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**6.** 900 A.2d 639, 644 (Del.2006) (emphasis added).

**7.** Officer Craft stated that reading the charges to the prisoners is "not standard operating procedure [but he] do[es] it frequently." App. to Appellant's Opening Br., at A–34.

ting response from the suspect."[8] The Superior Court found that Craft's question, having been asked as part of, and to facilitate, fingerprinting, was not the functional equivalent of interrogation. We disagree. Craft's entire conduct was the functional equivalent of interrogation, and his asking whether Ares had any children is not within the "routine booking question"[9] exception to *Miranda*.

Craft testified that his intention in asking that question was to keep Ares relaxed while taking his fingerprints. But, the answer was not needed as part of the biographical data required to complete booking, or to fill out an arrest report, or to seek a warrant. Thus, Craft's conduct was not reasonably related to police administrative concerns "normally attendant to arrest and custody[,]"[10] and, in these specific circumstances, Craft should have known that his question was likely to elicit an incriminating response.

The State relies on *United States v. Thompson*,[11] where the arrested suspect was asked by a police officer how many children he had, to which the suspect answered "none." That statement turned out to be important, because the suspect had previously told the police (after being stopped for speeding) that he was returning from a trip to Atlanta to "drop his baby off" with his mother. The prosecution's closing argument stressed that the suspect had lied about having a child and, therefore, about the purpose of his trip. The Fourth Circuit held that the response was admissible into evidence because the question "was attendant to … arrest and booking" and therefore did not constitute an interrogation.

The facts at bar are different in at least two important ways. First, the suspect in *Thompson* had not invoked his *Miranda* rights, whereas here Ares received the required warnings and did assert his *Miranda* rights. Second, the *Thompson* statement, given in response to a seemingly innocent question, provided "vital" ammunition for the prosecution's case, whereas here (as discussed below), the defendant's statement to Craft added nothing to the material facts.

■ Ares' first admission (Statement # 1, about having a gun), made while Craft was reading him the charges, should have alerted Craft to the risk that Ares might make other potentially incriminating statements. Ares was being charged with the attempted murder of his wife whom he had just found in bed with another man. Where a police officer has reason to know that a suspect's answer may incriminate him, even routine questioning can amount to interrogation.[12] A question regarding a suspect's family, although not normally objectionable, might assume a completely different character if asked in the context of an attempted murder of a spouse. Here, Craft knew that Ares had invoked his *Miranda* rights and understood that this meant he could not ask Ares "anything about the incident, anything incriminating." Although Craft said that he was

8. *Upshur v. State*, 2004 WL 542164, at *1 (Del.2004) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301–02, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)).

9. *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990).

10. *Innis*, 446 U.S. at 301–02, 100 S.Ct. 1682 (1980); *Rosa v. McCray*, 396 F.3d 210, 221

(2d Cir.2005); *Herring v. State*, 2006 WL 3062899, at *2 (Del.Supr.).

11. 195 Fed.Appx. 191 (4th Cir.2006).

12. *See United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir.1989); *United States v. Mata–Abundiz*, 717 F.2d 1277, 1279 (9th Cir.1983).

"casually talking just to keep [Ares] relaxed so [he] could obtain good fingerprints," Ares never gave the officer any indication that he was not relaxed. Indeed, Craft testified that Ares had been "very cooperative" and "wasn't a problem at all." In these circumstances, before initiating further discussions beyond the necessary biographical information the officer should have reminded Ares that he was not required to talk to him.[13]

For the above reasons, we hold that Craft's eliciting the statements during booking was a violation of *Miranda.* As a result, the admission of those statements into evidence constituted error.

*Was the Error Harmless Beyond a Reasonable Doubt?*

■ The next issue is whether the error was "harmless beyond a reasonable doubt." [14] We conclude that the error was harmless, for the following reasons: (i) Statement # 2 was cumulative, since virtually all of it came into evidence at trial from other sources [15] and was not contradicted in any material way; and (ii) even without Statement # 2, there was overwhelming independent evidence of Ares' state of mind at the time the crimes were committed.

Wholly apart from Statements # 1 and # 2, and before any police interrogation, Ares had already voluntarily disclosed most of what he told Craft: during his 911 call; during arguments with his wife; during his call to his supervisor at the hospital; and to the police, both at the scene and in the car. Ares later made similar statements to Dr. Mechanik. Rose, the police officers, Margaret Wilson and Dr. Mechanik testified at trial about these disclosures, and their testimony did not conflict in any material way with what Ares told Craft in Statement # 2.[16]

Ares points to his having told Craft that, before he started shooting, Davis lunged at him and argues that the admission of that utterance was harmful, because it was the only portion of Ares' statement to Craft that did not come into evidence through other witnesses. We fail to see how this factual element was detrimental to Ares' defense. Ares was charged with first-degree murder and attempted first-degree murder. There was never any dispute that Ares had committed the crimes with the requisite intent. At trial, Ares presented only an EED defense. The defenses of provocation or self-defense were defenses that were never raised or argued.

Next, Ares contends that the admission of his statements to Craft was not harmless error because his EED defense was undercut by the testimony that Ares told Craft that: (i) Ares knew his wife was having a relationship with someone; (ii) Ares asked Rose not to bring anyone into the house; and (iii) Ares was suspicious

---

13. *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (officer reminded the defendant of his right not to talk to him where the officer interpreted the question as "relating generally to the investigation").

14. *Van Arsdall v. State,* 524 A.2d 3, 10–11 (Del.1987).(citing *Chapman v. California,* 386 U.S. 18, 24; 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *Nelson v. State,* 628 A.2d 69, 77 (Del.1993).

15. *See Brinkley v. State,* 1986 WL 17992, at *3 (Del.Supr.).

16. Ares vaguely points to conflicting testimony regarding why he left work and went home on October 2, 2005, which (he urges) undercut his extreme emotional distress ("EED") defense. We do not agree. These conflicting statements about his motive for leaving work (to get coffee, fix tires or retrieve medication) actually supported Ares' EED defense, in that they tended to show that he was agitated and somewhat confused at the time he left the hospital.

something was happening that night because his wife had come home early from work. This argument lacks merit, because evidence of those facts came in through independent sources.

Rose testified that during one of their numerous arguments, Ares told her "you do your thing, I'm going to do mine and ... leave indiscrepancies [sic] ... outside of the house." The fact that Ares was suspicious about that particular evening came into evidence through Ares' call to 911 immediately after the shootings. During that call, Ares told the operator "I caught them together in bed. I came home early because I know my wife was ... doing something. So I went home *immediately* from work." Ares told Dr. Mechanik that, while at the hospital, he had noticed that "[Davis] had signed up for overtime, but ... wasn't at work." And, Rose testified that upon entering the guest bedroom, Ares said "I followed you or I had you followed" or "something to that effect."

Given Ares' EED defense, and his admission that he shot Davis and Rose, the critical issue at trial was Ares' state of mind at the time of the shootings. As the prosecution stated in the closing argument, whether or not Ares knew or suspected or condoned his wife's affair was "crucial." Because the record shows beyond any reasonable doubt that Ares suspected that his wife was having an affair and which person she was having the affair with, Ares' disclosure of those facts to Craft was cumulative. We are satisfied, after careful examination of the record, that the evidence of Ares' state of mind had "overwhelming weight." [17] For these reasons, we affirm

the denial of Ares' motion to suppress Statement # 2.

### The Motion to Exclude Ares' Racial Epithet from Rose's Testimony

 Ares next challenges the Superior Court's denial of his motion to preclude, during Rose's testimony, any reference to a racial epithet directed by Ares at Davis during and immediately after the shootings. This Court reviews decisions of a trial court regarding the admissibility of evidence for abuse of discretion, recognizing that "the trial judge is in a unique position to evaluate and balance the probative and prejudicial aspects of the evidence." [18] The trial court's duty to balance the probative value of evidence against its potentially prejudicial effect under D.R.E. 403 "becomes especially important when the evidence tends to be racially charged." [19]

Rose testified that Davis fell to the floor after Ares shot him and that Ares then leaned over the bed, pointed the gun down at Davis and shot him again, calling him a "fucking nigger." Rose further testified that Ares returned to the room with a machete, called her a whore, expressed his disbelief that she was "still calling that fucking nigger's name," and then left the room again.

Before Rose testified, the trial judge considered Ares' motion to suppress *in limine*. The Superior Court held that, under D.R.E. 403, the contested epithet had probative value because "the use of [that] word in [those] circumstances goes directly to [Ares'] state of mind" and that it was not so unfairly prejudicial as to be excludable. The issue is whether the trial judge abused his discretion in so ruling.

---

17. *McKinney v. State*, 466 A.2d 356, 361 (Del. 1983).

18. *Floudiotis v. State*, 726 A.2d 1196, 1202 (Del.1999) (citing *Smith v. State*, 560 A.2d 1004, 1007 (Del.1989)).

19. *Zebroski v. State*, 715 A.2d 75 (Del.1998); *Zimmerman v. State*, 628 A.2d 62 (Del.1993); *Weddington v. State*, 545 A.2d 607 (Del.1988); *Duonnolo v. State*, 397 A.2d 126 (Del.1978).

We find no abuse of discretion. In *Zebroski v. State*[20] this Court reviewed the admission of testimony that included the use of a racial epithet by a defendant in a murder trial. A trial witness testified that shortly after the murder, the defendant, who was white, admitted to him that he "shot the nigger." We held that the "introduction into the evidence of the racial epithet in the context of that case was proper where the evidence indicated more than mere abstract belief" and was "probative of the [defendant's] intent and state of mind at the time of the shooting."[21]

Ares argues that his epithetical comments had no probative value, because he had conceded intent and focused solely on EED—a defense that is implicated only after the State has proven all the elements of first degree murder, including intent.[22] We conclude the contrary. Ares' state of mind at the time of the shooting was highly relevant to his EED defense, because such state-of-mind evidence may tend to downgrade the defendant's culpability to the level of manslaughter. For this reason, epithetical statements such as the ones at issue here, made by a defendant while shooting the victim and repeated seconds or minutes thereafter, were important to the prosecution seeking to counter an EED defense.[23] The use of that racial epithet could show that the defendant was merely angry and agitated, or that he had little regard for the value of the victim's life. Neither state of mind would amount to EED.

We recognize that the admission of Ares' epithetical remarks was unfortunate and likely inflammatory. Nonetheless, we cannot conclude that the prosecution improperly injected race into the case to deprive Ares of a fair trial. The prosecution made no effort to depict Ares as a racist. Ares' statement was relevant to the issues, and was directed specifically at the victim. That distinguishes this case from *Weddington*[24] (where the prosecutor asked a racially charged question, for which he admitted having no factual basis) and *Floudiotis*[25] (where the prosecutor introduced evidence of neo-Nazi symbols, although the defendant was charged with assault on white victims). In both of those cases we found that the trial court had abused its discretion because the prejudicial effect of the contested evidence outweighed its probative value.

Moreover, neither during opening nor closing arguments did the prosecutors repeat or even refer to the racial epithet. In *Alcocer v. State*, this Court held that the State did not improperly inject race into the case because the racial epithet at issue there "was stated in the first instance by *witnesses*, not by the prosecutor who merely repeated the term in summation."[26] The State also introduced a recording of Rose's call to 911. In the background, Ares' may be heard using the same racial epithet immediately after the shootings. Ares argues that because this tape was in evidence, it was unnecessary for the State to present Rose's testimony about Ares calling the victim a "nigger." We disagree. The transcript of the tape does not reflect any racial comments, most likely because Ares' voice is barely audible and difficult to understand, as the defense

**20.** 715 A.2d 75 (Del.1998).

**21.** *Zebroski,* 715 A.2d at 79–80.

**22.** *See* 11 *Del. C.* § 641.

**23.** *See Duonnolo,* 397 A.2d at 128–29.

**24.** *Weddington v. State,* 545 A.2d 607 (Del. 1988).

**25.** *Floudiotis,* 726 A.2d at 1196 (Del.1999).

**26.** *Alcocer v. State,* 1991 WL 57102 at *2 (Del.Supr.) (emphasis added).

agrees. Further, the tape did not cover the statement Ares made during his shooting of Davis. Therefore, race was not improperly injected into the case.

Finally, Ares argues that the prejudicial impact of admitting the racial epithet was significantly compounded by the fact that the trial court, in a *sua sponte* oral ruling, refused to provide a cautionary instruction to the jury. The Superior Court held that "any cautionary instruction ... would ... draw attention to [the epithet] and frankly would tell the jury it goes to the issue of state of mind which is telling them it goes to the heart of the case."

Although providing cautionary instructions to the jury where unredacted recordings or documents are admitted into evidence[27] may be the better practice, the trial judge has broad discretion to determine whether the relevance of evidence is outweighed by its prejudicial character. Here, given the strength of the case against the defendant, the admission of the racial remarks and the absence of a cautionary instruction were not unfairly prejudicial.[28] Additionally, Ares' conviction of the lesser included offense of second degree murder evidences that the jurors did not act on the basis of passion and prejudice.

### CONCLUSION

For the reasons set forth above, the judgments of the Superior Court are affirmed.

---

**27.** *U.S. v. Worthington*, 1990 WL 116618, at *4–*5 (4th Cir. July 31, 1990); *Weddington*, 545 A.2d at 614–15; *Richardson v. Kentucky*, 2003 WL 22461673, at *5 (Ky.App. Oct. 31, 2003).

**28.** *See, e.g., Com. v. Abbott*, 2001 WL 1590279, at *3 (Mass.App.Ct. Dec. 13, 2001)

(booking tape on which defendant cries out same racial epithet had only incremental probative value and its admission was harmless error in light of the strong case against defendant).