Robert W. JACKSON, III, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Nos. 162, 1993 and 169, 1993.

Supreme Court of Delaware.

Submitted: July 8, 1994.
Decided: July 15, 1994.
Rehearing Denied July 20, 1994.

Kevin J. O'Connell, Wilmington, for appellant.

Richard E. Fairbanks, Jr. (argued), Chief of Appeals Div., Loren C. Meyers and Timothy J. Donovan, Jr., Deputy Attys. Gen., Dept. of Justice, Wilmington, for appellee.

Before VEASEY, C.J., MOORE, WALSH, HOLLAND and HARTNETT, JJ., constituting the Court en banc.

WALSH, Justice:

This is an appeal from the imposition of the death penalty in the Superior Court. The appellant, Robert W. Jackson, III ("Jackson"), was convicted of two counts of Murder First Degree, Burglary Second Degree, Conspiracy Second Degree, Robbery First Degree, and three counts of Possession of a Deadly Weapon during the Commission of a Felony. Following a sentencing hearing, the jury unanimously found that the State had established two statutory aggravating circumstances beyond a reasonable doubt and, by a vote of 11–1, found that the aggravating circumstances outweighed the mitigating circumstances found to exist. 11 *Del.C.* § 4209(c)(3). The Superior Court judge, undertaking the required statutory analysis, reached the same ultimate conclusion.[1] 11 *Del.C.* § 4209(d). Accordingly, he sentenced Jackson to death for each of his two convictions for Murder First Degree.[2]

On appeal, Jackson challenges both his convictions and death sentences. We find no error with respect to the guilt/innocence phase of Jackson's trial and therefore affirm his convictions. However, we conclude that Jackson's Sixth Amendment right to counsel, as applied to the States through the Fourteenth Amendment, was violated by the introduction of taped conversations between Jackson and a state agent into evidence during the sentencing hearing. We cannot conclude that this constitutional error was harmless beyond a reasonable doubt. Accordingly, the sentences of death are vacated and the matter is remanded for a new sentencing hearing.

---

1. The judge, however, considered the two statutory aggravating circumstances urged by the State, the murder was committed during a burglary and during a robbery, to constitute only one statutory aggravating circumstance. *See* 11 *Del.C.* § 4209(e)(1)j.

2. Jackson was also sentenced to 10 years imprisonment for each of the weapons convictions, 10 years for the robbery conviction, four years for the burglary conviction, and two years for the conspiracy conviction.

## I

The evidence presented at trial reflected the following events. During the afternoon of April 3, 1992, Jackson and Anthony Lachette ("Lachette") decided to burglarize a house in order to obtain money to buy marijuana. Lachette suggested they break into the home of Elizabeth Girardi. Lachette was familiar with the residence since he was acquainted with one of Mrs. Girardi's children. No one was at home when the two broke into the house through the back door. Jackson wore a pair of gardening gloves he had brought with him. Once inside, the two gathered property that included jewelry, rare coins, compact discs, firecrackers, and a camera. After placing the stolen property in paper bags, Jackson and Lachette left the house the way they entered. As they headed toward the driveway, where Jackson had parked the car, they saw Mrs. Girardi, who had arrived home and was walking towards Jackson's car. Lachette decided to flee despite Jackson's attempt to persuade him to stay. Lachette then dropped his bag and ran off, leaving Jackson behind.

After Lachette ran off, Jackson grabbed an ax from a shed and confronted Mrs. Girardi in the driveway. A struggle ensued, during which Mrs. Girardi fell to the ground, whereupon Jackson struck her several times in the face with the ax. Jackson then loaded his car with the stolen property. Before leaving, Jackson noticed that Mrs. Girardi was still alive. He struck her several more times in the face with the ax, killing her, and then left the scene. Shortly thereafter, Jackson found Lachette walking along the road and picked him up. Jackson then told Lachette that he had killed Mrs. Girardi. Lachette noticed blood on Jackson's gloves and pant legs. Over the course of the next week, Jackson watched television news reports and spoke with Lachette and James Burton ("Burton"), his roommate and longtime friend, about the Girardi murder. During that time, Jackson told Burton that he had killed Mrs. Girardi.

On April 9, 1992, Burton and Carl Roca ("Roca"), a friend, sold a bracelet stolen in the Girardi burglary to a pawn shop in Elsmere. Pawn shop owners in the area had been alerted by the police to be on the lookout for certain pieces of property stolen from the Girardi residence. The pawn shop owner contacted the police, who, following an investigation, obtained warrants authorizing the search of Burton's and Roca's residences and also authorizing the police to take Burton and Roca into custody to obtain clothing, fingerprints, and hair and blood samples from their persons.

When the police arrived at Burton's residence, they learned from his parents that he had moved out and was living with Jackson. Conducting surveillance in the area near Burton's and Jackson's apartment, police observed Burton and two companions enter a car and drive off. The police followed, eventually stopping the car for two motor vehicle violations. Lachette was driving, Jackson was in the front passenger seat, and Burton was in the rear seat. Upon opening the driver's door, the police observed a 14-inch metal pipe partially concealed between the driver's seat and door. After Lachette exited the vehicle, the police folded the driver's seat-back forward to allow Burton access to the door. Upon doing this, a plastic bag containing marijuana was discovered in the folding area where the seat-back and cushion meet. All three of the vehicle's occupants, including Jackson, were then arrested for carrying a concealed deadly weapon and possession of marijuana. Before placing Jackson in a holding cell, the police, pursuant to standard procedures, removed certain articles of property and clothing from his person, including his sneakers. Later that night, when police discovered that Lachette and Jackson were involved in the Girardi burglary/homicide, the sneakers were seized as evidence. The sole of one of Jackson's sneakers was later determined to be consistent with foot prints found at the murder scene.

While in custody on the concealed weapon and marijuana charges, Lachette confessed to his role in the burglary and implicated Jackson in the Girardi murder. Subsequently, he gave a full statement to the police regarding the details of the burglary and Jackson's remarks regarding the murder. Additionally, Burton eventually gave a full statement to police, which included details of

Jackson's remarks to him regarding the murder. Both Lachette and Burton testified for the State at trial. Following Lachette's initial confession, Jackson was arrested for the burglary/murder.[3]

## II

Jackson asserts five claims of error with respect to the guilt/innocence phase of his trial: (1) the trial court erred in "death qualifying" the jury; (2) the trial court erred in denying his motion to strike from evidence his sneakers seized without a warrant; (3) the trial court erred in failing to grant his motion to suppress the fruits of a nighttime search of his residence; (4) the trial court abused its discretion in permitting testimony regarding Jackson's desire to microwave Girardi's cat; and (5) the trial court abused its discretion in admitting into evidence certain hearsay testimony. We address these claims *seriatim.*

### A.

■ Jackson asserts that it was plain error for the trial judge to strike for cause four potential jurors because they expressed personal reservations concerning the imposition of the death penalty. *See Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Since the trial judge is the ultimate sentencer under Delaware's revised death penalty statute, 11 *Del.C.* § 4209, Jackson argues that there is no reason to strike jurors who entertain death penalty reservations because they are not called upon to pass sentence. Accordingly, Jackson concludes, he was improperly denied a trial by an impartial jury of a cross-section of his peers. Jackson acknowledges that this Court rejected an identical argument in *State v. Cohen,* Del.Supr., 604 A.2d 846, 855–56 (1992).

Although not the final arbiters of punishment, jurors still play a vital and important role in the sentencing procedure. The jury sits as the conscience of the community in deciding whether to recommend life imprisonment or the death penalty. Any

personal views which would prevent its members from impartially performing this solemn responsibility in accordance with the trial court's instructions are impermissible and contrary to law.

*Id.* at 856 (citations omitted). We adhere to our view in *Cohen* and reject this claim of error.

### B.

Jackson next claims that the Superior Court erred in refusing to suppress as evidence his sneakers, which were taken when he was placed in a holding cell while in custody for the concealed weapon and drug charges. When police later learned that Jackson was involved in the Girardi murder, the sneakers were seized as evidence. The evidentiary value of the sneakers was twofold: they had spots of human blood on them, and the sole of one of the sneakers matched a footprint left at the murder scene. Jackson argues that police did not have probable cause to arrest him on the weapons and drug charges, and therefore, the sneakers, fruit of an illegal arrest, were improperly admitted into evidence. Since we agree with the trial judge that the police had probable cause to arrest Jackson, we find no error with respect to the admission into evidence of the sneakers.

■ A police officer may make a warrantless arrest for any felony, such as carrying a concealed deadly weapon, or for a misdemeanor committed in his presence, such as possession of marijuana, if he has reasonable ground to believe the person to be arrested has committed the crime. 11 *Del.C.* § 1904. Reasonable ground means probable cause. *Thomas v. State,* Del.Supr., 467 A.2d 954, 957 n. 3 (1983). Once a person is lawfully in custody, police may impound the arrestee's clothing and personal effects pursuant to standard practice. *United States v. Edwards,* 415 U.S. 800, 804–05, 94 S.Ct. 1234, 1237–38, 39 L.Ed.2d 771 (1974). Here, the sneakers were taken pursuant to a written police policy of impounding an arrestee's footwear before placing him in a holding cell. When the evidentiary value of the

---

**3.** Lachette was also arrested and indicted on various charges, including Murder First Degree. He subsequently pleaded guilty to Burglary Second Degree and Conspiracy Second Degree.

sneakers was realized, they were properly seized as evidence. *See id. See also United States v. Oaxaca,* 9th Cir., 569 F.2d 518, 523–24, *cert. denied,* 439 U.S. 926, 99 S.Ct. 310, 58 L.Ed.2d 319 (1978). Thus, the dispositive question is whether police had probable cause to arrest Jackson for the weapon and/or marijuana charges.

"Probable cause is an elusive concept which avoids precise definition.... It lies somewhere between suspicion and sufficient evidence to convict." *Thompson v. State,* Del.Supr., 539 A.2d 1052, 1055 (1988). "To establish probable cause, the police are only required to present facts which suggest, when *those facts* are viewed under the totality of the circumstances, that there is a fair probability that the defendant has committed a crime." *State v. Maxwell,* Del.Supr., 624 A.2d 926, 930 (1993) (emphasis in original). "A finding of probable cause does not require the police to uncover information sufficient to prove a suspect's guilt beyond a reasonable doubt or even to prove that guilt is more likely than not." *Id.*[4]

■ Jackson concedes that the existence of the pipe and drugs gave rise to probable cause to believe that two crimes were being committed. He argues, however, that his presence in the vehicle, without more, was insufficient to establish probable cause to arrest *him* for the crimes. In our view, probable cause clearly existed to arrest Jackson for possession of marijuana. Since a lawful arrest for the drug charge sustains the subsequent seizure of his sneakers, we need not decide whether the police had probable cause to arrest Jackson on the weapon charge.

Having found contraband in the vehicle occupied by Jackson, Lachette and Burton, the police had knowledge that a crime was being committed by one, two or all three occupants of the car. There was no way of identifying the responsible party or parties at that time, except for the fact that each individual was an occupant of the vehicle in which the contraband was found in a non-secretive location. In view of the nature of

illegal drugs and the fact that they are frequently used by individuals in groups, there was a reasonable likelihood that the marijuana was jointly possessed by all three occupants. Under the totality of the circumstances, there was a fair probability that each occupant of the vehicle, including Jackson, had committed a crime and therefore probable cause to arrest existed, even if the evidence was insufficient to sustain convictions on the charge. *Maxwell,* 624 A.2d at 930. *See Fernandez v. Perez,* 7th Cir., 937 F.2d 368, 370 (1991); *United States v. Cummins,* 9th Cir., 920 F.2d 498, 502 (1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991). *United States v. Heiden,* 5th Cir., 508 F.2d 898, 901–02 (1974); *Elk v. Townson,* S.D.N.Y., 839 F.Supp. 1047, 1051–52 (1993); *State v. Roberts,* R.I.Supr., 434 A.2d 257, 263 (1981).

We find unpersuasive Jackson's reliance upon *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). In *Di Re,* the United States Supreme Court, applying a New York statute somewhat similar to 11 *Del.C.* § 1904, found no probable cause existed to arrest the defendant, on whose person counterfeit gasoline ration coupons were subsequently found. There, police had been told by an informant, Reed, that he was going to buy counterfeit gasoline coupons from one Buttitta at a certain place. The police located Buttitta's car at the designated place and found Reed in the back seat holding gasoline ration coupons which later proved to be counterfeit. Upon being asked, Reed said he obtained them from Buttitta, who was in the driver's seat. Di Re was in the front passenger seat and was not implicated by Reed. There was no indication that any contraband was located in the automobile itself, apart from that on the person of one of its occupants. Di Re was nonetheless arrested, and *on his person police found counterfeit gas ration coupons.* He was subsequently convicted on federal charges stemming from their possession.

In finding no probable cause existed to arrest Di Re, the Supreme Court focused, in

4. Jackson's reliance on *Holden v. State,* Del. Supr., 305 A.2d 320 (1973) and *Crawley v. State,* Del.Supr., 235 A.2d 282 (1967) is therefore misplaced since those cases dealt with the sufficiency of the proximity evidence to sustain a conviction, not probable cause to arrest.

part, on the fact that Reed incriminated only Buttitta as a guilty party and not Di Re. "Any inference that everyone on the scene of a crime is a party to it must disappear if the Government informant singles out the guilty party." 332 U.S. at 594, 68 S.Ct. at 228. Here, the police had no way of knowing whether Jackson, Lachette, or Burton, or any combination of the three were responsible for the contraband. Thus, *Di Re* is clearly distinguishable on its facts. Finding contraband in an automobile occupied by several people is different from finding contraband on the person of one of several occupants of an automobile. We therefore find Jackson's reliance on *Di Re* unavailing and reject his claim of error.

## C.

Jackson's third claim is that the trial court erred in failing to suppress the fruits of an allegedly improper nighttime search of his residence. Following the arrest of Jackson, Burton, and Lachette, the police sought a warrant authorizing a nighttime search of Burton's (and Jackson's) residence. The warrant was issued at 12:15 a.m., and executed at 4:35 a.m. In the apartment, the police found property stolen from the Girardi residence.

Jackson claims the warrant and supporting affidavit failed to satisfy the requirements for obtaining a nighttime search warrant pursuant to 11 *Del.C.* § 2308, which provides:

A search warrant shall not authorize the person executing it to search any dwelling house in the nighttime unless the judge, justice of the peace or magistrate is satisfied that it is necessary in order to prevent the escape or removal of the person or thing to be searched for, and then the authority shall be expressly given in the warrant. For purposes of this section, the term "nighttime" shall mean the period of time between 10:00 p.m. and 6:00 a.m.

We have held that this statute "is clear and unambiguous and requires more than probable cause. It requires a determination that such action is necessary 'to prevent the escape or removal of the person or thing to be searched for.'" *Mason v. State*, Del.Supr., 534 A.2d 242, 251 (1987) (footnote omitted).

The affidavit attached to the warrant challenged here stated, in relevant part:

A nighttime search warrant is necessary since James Burton is currently in the custody of the New Castle County Police for the execution of a search warrant on his person. Once that search is concluded sometime this night, Burton will be released and any evidence that might be at his residence would be in danger of being moved or destroyed.

The magistrate issued a search warrant, explicitly authorizing a nighttime search "in order to prevent the escape or removal of the person or thing to be search [sic] for."

 Relying on *Mason*, Jackson challenges the determination that a nighttime search was warranted. However, we view this matter as controlled by our decisions in *Dixon v. State*, Del.Supr., 567 A.2d 854 (1989) and *Jensen v. State*, Del.Supr., 482 A.2d 105 (1984), not *Mason*. As we observed in *Dixon*:

In *Mason*, the defendant (Mason) had supplied another man (Barnett) with a quantity of cocaine. Barnett sold this cocaine to police officers, who immediately placed Barnett under arrest. Mason was not in the vicinity of the arrest, there was no objective evidence tending to support the assertion of the police that Mason would learn of the arrest before morning and the police had no support for their contention that evidence would be destroyed if a nighttime search was not conducted. In fact, the only evidence known to exist in Mason's apartment was marked money to purchase an amount of cocaine earlier that evening. The Court found that Mason, even if he knew of police surveillance, was unlikely to have a desire to destroy money. *Mason*, 534 A.2d at 252.

*Dixon*, 567 A.2d at 856. Here, however, the facts are parallel to those in *Dixon* and *Jensen*, where the suspects were in custody and therefore knew of police involvement and would likely seek to destroy or remove any evidence upon their release. Given the fact that Burton was in temporary police custody and expected to be released during the night, "the police had a reasonable basis to believe

that if the search warrant [was] not executed that evening the evidence would be destroyed." *Dixon*, 567 A.2d at 856.

Jackson contends that since Burton was not in fact released until after 6:00 a.m., there was no need to conduct an immediate nighttime search. At midnight, however, when they applied for the search warrant, the police could not be certain when Burton would be released from custody. Similarly, the police in *Dixon* and *Jensen* could not be certain whether the suspects would be able to post bail or would remain incarcerated through the night. Furthermore, here the police also had in custody on minor charges both Lachette and Jackson, neither of whom was a suspect in the Girardi burglary/homicide when police applied for the warrant, but who, when released, might try to assist their friend by removing or destroying evidence. In applying for the warrant, the police were not required to peer into the future and accurately forecast the night's developments. They were entitled to rely upon reasonable expectations. Similarly, the facts known to the magistrate when he signed the warrant, not those which developed at some later time, are the relevant facts in assessing the need for a nighttime search. *See Jensen*, 482 A.2d at 111. "We find that the police alleged with particularity facts sufficient for a neutral judicial officer to find probable cause to believe that a nighttime search was necessary to prevent the removal of the object of the search, as required by 11 *Del.C.* § 2308." *Dixon*, 567 A.2d at 856.[5]

### D.

■ Jackson next argues that the trial judge abused his discretion when he permitted the State to elicit testimony from Lachette, over objection, about Jackson's desire to microwave Mrs. Girardi's cat during the burglary. This testimony was elicited in connection with Lachette's description of the events surrounding the burglary and leading up to Mrs. Girardi's murder. Jackson claims this evidence was irrelevant and highly prejudicial, and therefore inadmissible under D.R.E. 401 and D.R.E. 403. The trial judge ruled that the testimony went to Jackson's state of mind immediately prior to the murder and overruled the objection.

Jackson's state of mind was relevant to the intent element of Murder First Degree. 11 *Del.C.* § 636(a)(1). In order to show that Jackson intentionally killed Mrs. Girardi, the State had to prove that it had been his conscious object to cause her death. *See* 11 *Del.C.* § 231(a)(1). To make that showing, the State could adduce evidence of Jackson's state of mind. *Duonnolo v. State*, Del.Supr., 397 A.2d 126, 128–30 (1978). In *Duonnolo*, an appeal from a murder conviction, the defendant's statement that he "ought to go back and shoot the black man they had seen hitchhiking" and his remarks to another person, asking "her something like 'How would it feel to die?,'" were held to be "relevant to defendant's state of mind minutes before the homicide." *Id.* at 129. While Jackson's statement about microwaving the cat did not relate to killing a human, as did the statements in *Duonnolo*, we cannot conclude that the trial judge abused his discretion by finding it to be relevant evidence of a mental state that could lead him to kill Mrs. Girardi, instead of choosing to flee, as Lachette did, upon her return home.

Additionally, we do not find that the relevance of the evidence was "substantially outweighed by the danger of unfair prejudice" so as to warrant its exclusion under D.R.E. 403. While the act of microwaving a cat may have depicted Jackson as a cruel, sadistic person, *see State v. Tweedie*, R.I.Supr., 444 A.2d 855 (1982), the jury had already heard from Roca and Burton that Jackson had told each of them that he had killed a cat. Roca explained that it was the source of blood on a pair of gloves he was discarding. Burton related how Jackson told him, Roca, and

---

5. To the limited extent that Jackson contends that the search warrant was constitutionally infirm because it was not supported by probable cause, his argument is completely devoid of merit. To the contrary, the six page affidavit attached to the application for the warrant contained extensive and detailed facts overwhelmingly supporting the magistrate's finding of probable cause. Moreover, Jackson's failure to address this issue in the text of his opening brief (as distinct from the headings and table of contents) constitutes a waiver of the claim on appeal. *Murphy v. State*, Del.Supr., 632 A.2d 1150, 1152 (1993).

Lachette about ripping a cat in half with his hands. Given this earlier testimony, to which Jackson did not object, and the fact that the questioning on this point was very brief, there was no danger of unfair prejudice with respect to Lachette's testimony. Jackson's claim to the contrary clearly fails. *See United States v. Sickles,* D.Del., 524 F.Supp. 506, 511 (1981), *aff'd,* 3d Cir., 688 F.2d 827 (1982).

### E.

Jackson's final claim with respect to the guilt/innocence phase of his trial is that the trial judge abused his discretion in permitting Detective Scott McClaren ("McClaren"), the chief investigating officer, to present hearsay testimony, pursuant to 11 *Del.C.* § 3507, about his conversation with Burton on April 30, 1992. When Burton was taken into custody on April 9, he did not disclose to the police Jackson's inculpatory statements concerning Mrs. Girardi. The police suspected Burton knew more than he was saying, and, on April 30, re-interviewed him in the offices of the Department of Justice regarding his knowledge of the crime. Present were McClaren and two deputy attorneys general. The interview was tape-recorded. As the interview progressed, McClaren continued to suspect that Burton was not disclosing all he knew and asked to speak with Burton alone with the tape recorder turned off. It was then that Burton told McClaren of Jackson's confession to him. Burton then repeated on tape what he had told McClaren, and his trial testimony was consistent with these statements.

■ After Burton testified at trial, McClaren testified, over objection, regarding

Burton's off-tape statement, pursuant to 11 *Del.C.* § 3507, which permits the use of prior statements as affirmative evidence.[6] A declarant's out-of-court statement may be admitted pursuant to section 3507 only if the declarant testifies at trial both as to the events perceived or heard and the truthfulness of the out-of-court statements. Further, in order to preserve the defendant's right to confront the witnesses against him,[7] the declarant must also be subject to cross-examination on both the content of the statement and its truthfulness. *Ray v. State,* Del.Supr., 587 A.2d 439, 443 (1991); *Keys v. State,* Del.Supr., 337 A.2d 18, 20 n. 1 (1975).

■ Here, Burton, the declarant, testified at trial that his initial statements to the police had not been truthful, but that on April 30, in the presence of McClaren, he decided to tell what he knew. He repeatedly insisted, on both direct and cross-examination, that he told McClaren the truth, thereby satisfying the truthfulness prong of the section 3507 analysis. Burton testified that at that meeting he told McClaren and the prosecutors that Jackson had told him "you can get away with murder." He did not, however, testify as to what he and McClaren discussed when they met in private with the tape recorder turned off, other than stating that that is when he "came clean" and decided to tell the truth.

While there may have thus been a technical non-compliance with the requirements for the admission of prior statements pursuant to section 3507, it was clearly one of form rather than substance. Burton's testimony at trial was consistent with his prior statements to McClaren, statements he repeatedly insisted were true under vigorous cross-

6. 11 *Del.C.* § 3507. Use of prior statements as affirmative evidence.

(a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

(b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party.

(c) This section shall not be construed to affect the rules concerning the admission of statements of defendants or of those who are codefendants in the same trial. This section shall also not apply to the statements of those whom to cross-examine would be to subject to possible self-incrimination.

7. *See* U.S. Const.Amend. VI ("In all criminal prosecutions the accused shall enjoy the right ... to be confronted with the witnesses against him...."); Del. Const. Art. I, § 7 ("In all criminal prosecutions the accused hath the right ... to meet the witnesses ... face to face....").

examination. Jackson had prior knowledge of these statements and what McClaren's testimony would be by virtue of the fact that he was given a copy of McClaren's police report describing what Burton had said during the off-tape conversation. Indeed, Jackson cannot demonstrate any prejudice whatsoever from the admission of McClaren's testimony since Burton's trial testimony was consistent with McClaren's recounting of the off-tape conversation. Given these facts, we find that any technical non-compliance with the foundational requirements of section 3507 was harmless beyond a reasonable doubt. *See* D.R.E. 103(a); *Spencer v. State*, Del. Supr., 307 A.2d 794, 796 (1973).

Having found no reversible error in any of the claims asserted by Jackson respecting the guilt/innocence phase of his trial, his convictions, including those for Murder First Degree, are affirmed. We next turn to the claims of error respecting the sentencing phase of the trial.

\* \* \* \* \* \*

Jackson mounts five challenges to the propriety of his death sentences: (1) the trial court improperly admitted into evidence incriminating statements taken in violation of his Sixth Amendment right to counsel; (2) the prosecutor's questioning of several defense witnesses regarding Jackson's lack of remorse violated his Fifth Amendment privilege against self-incrimination; (3) the trial court erred in instructing the jury and itself applied an erroneous standard with respect to the standard of proof of non-statutory aggravating circumstances; (4) the imposition of the death penalty for felony murder is unconstitutional because Delaware's death penalty statute does not sufficiently narrow the group of death-eligible defendants; (5) his death sentences are not proportionate to the sentence imposed in similar cases. Because we find reversible error with respect to Jackson's Sixth Amendment claim, we need not resolve all aspects of the Fifth Amendment claim, although we express our view on

this issue in an effort to provide guidance to the trial court at Jackson's new sentencing hearing. Jackson's other claims of error are without merit. Given the fact that we are vacating Jackson's death sentences on Sixth Amendment grounds, we find it unnecessary to perform our statutorily mandated review. *See* 11 *Del.C.* § 4209(g).

### III

#### A.

The State presented evidence at the penalty hearing following the guilty verdict that Jackson, while in prison awaiting trial, attempted to arrange for the murder of Burton, one of the State's key witnesses. Earlier, during the guilt/innocence phase of the trial, the State also presented evidence that Jackson had solicited Andre Johnson ("Johnson"), a fellow inmate at the Multi–Purpose Criminal Justice Facility (Gander Hill Prison), to kill Burton upon Johnson's release from prison. After Johnson's release, Jackson sent him a letter discussing, in code, Burton's death, along with a photograph of Burton and a map to his residence. Johnson decided not to participate and delivered these materials to the Attorney General's office.[8]

The penalty phase evidence involved Jackson's efforts to elicit the assistance of Victor Talmo ("Talmo") in an effort to kill Burton. Talmo was Jackson's cell mate at Gander Hill. Talmo testified that as early as September 8, 1992, when he began taking notes, Jackson offered to assist Talmo obtain money to post bail. Two days later, Jackson told Talmo that he wanted Burton killed, and was attempting to arrange for bail in order to facilitate the murder plot. On September 21, Detective McClaren interviewed Talmo, presumably at Gander Hill. While the record is unclear, it appears that Talmo told McClaren that he was keeping a diary and had been given a photo of Burton and a map to his residence, but eventually Jackson took back

---

8. It appears from the record that a taped conversation between Johnson and Jackson, presumably discussing Jackson's desire to have Burton killed, was in the possession of the State at trial. However, Jackson objected to its admission on several grounds, including alleged violations of the Sixth Amendment and Superior Court Criminal Rule 16, regarding discovery in criminal cases. The State conceded a discovery violation with respect to the tape recording and did not offer it into evidence.

the photo and map. Apparently, McClaren did not ask Talmo to elicit information regarding the Girardi murder, but did ask Talmo to obtain information about the plot to kill Burton.

On September 24, Johnson contacted the State and indicated that Jackson sought to enlist him in a plot to kill Burton. The next day, the State abandoned its plan to obtain a wire tap on the telephone of Jackson's mother, and instead decided to accept Johnson's offer of assistance. Talmo was apparently placed "on a back burner" at that time, in part because the amount of his bail had been increased and he was still in custody. In late February 1993, Jackson sent Talmo a letter with a map to Burton's residence and, in code, asked Talmo to have Burton killed. Talmo again made contact with the State and was ultimately provided with recording equipment by Detective McClaren and asked to record his telephone conversations with Jackson. Talmo taped two phone calls from Jackson in March 1993, during the early phase of Jackson's trial, and turned the tapes over to the State.

Over objection, the tapes were played at the sentencing hearing and admitted into evidence, as were transcripts of the conversations. The dialogue of the tapes is somewhat cryptic, because of Jackson's distrust of the prison phone system, but the contents of the conversations were explained by Talmo on the witness stand and clearly support the claimed plot to murder Burton. On the tapes, Talmo deliberately elicits statements from Jackson regarding the plan to murder Burton.[9] The statements incriminate Jackson in a very serious matter—the murder of a key State witness—and demonstrate his hope that the murder will allow him to receive an offer of a plea bargain from the State.

This attempt to arrange, from prison, the murder of one of the State's key witnesses was used as evidence to show Jackson's violent propensities and future dangerousness and was considered by the trial judge to be a non-statutory aggravating circumstance. Jackson objected at trial and claimed, as he does on appeal, that Talmo was a state agent who deliberately elicited incriminating statements from him in violation of his Sixth Amendment right to counsel. Jackson claims that all of Talmo's testimony was inadmissible on Sixth Amendment grounds.

### B.

The Sixth Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment, guarantees the accused in all criminal prosecutions "the right ... to have the Assistance of Counsel for his defence." It is "indispensable to the fair administration of our adversarial system of criminal justice ... [and] safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding." *Maine v. Moulton,* 474 U.S. 159, 168–69, 106 S.Ct. 477, 483, 88 L.Ed.2d 481 (1985). As the United States Supreme Court observed long ago, in its landmark decision involving the notorious Scottsboro trial:

9. Excerpts of the tapes are as follows:

Talmo: And from everything you told me, you know, if you want, if you want this taken care of, man, tonight can be taken care of.... Well, you know, I, see, see the thing about it is man, it's gotta be done tonight....
Jackson: Yeah....
Talmo: Now, is, I mean, what exactly, you know what I'm saying? No show or what?
Jackson: Yeah. Vacation.
Talmo: Permanent?
Jackson: No show.

\* \* \* \* \* \*

Talmo: Listen to this man. 3½ hours last night. Can you hear me?
Jackson: Yeah.
Talmo: We waited 3½ hours. Nobody's there man. Nobody. Where are they at?

Jackson: I don't know. You got the place right?
Talmo: Yeah, I know, definitely, yeah. We waited and waited and waited man for almost, almost 3 hours and 45 minutes and I don't know man, I don't understand it. It looked like the whole place was deserted.

\* \* \* \* \* \*

Talmo: Well, then again, things might change, you know.
Jackson: Huh?
Talmo: Things might change here real soon, so....
Jackson: Yeah, I know.
Talmo: So, we'll see man.
Jackson: If that happens I think they'll stop and offer me a plea.

\* \* \* \* \* \*

The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with a crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel, he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. *He requires the guiding hand of counsel at every stage of the proceedings against him.*

*Powell v. Alabama,* 287 U.S. 45, 68–69, 53 S.Ct. 55, 63–64, 77 L.Ed. 158 (1932) (emphasis added). *See also Moulton,* 474 U.S. at 169, 106 S.Ct. at 483; *Gideon v. Wainwright,* 372 U.S. 335, 344–45, 83 S.Ct. 792, 797, 9 L.Ed.2d 799 (1963). It is for these reasons that every person charged with a serious criminal offense is entitled to the assistance of counsel, even if it be at the expense of the government, as is the case with an indigent defendant. *Id. See Shipley v. State,* Del. Supr., 570 A.2d 1159, 1166 (1990). As the language from *Powell* emphasized above indicates, the right to counsel is not limited to trial; it is to be recognized "at every stage of the proceedings." It applies at " 'critical' stages of the criminal justice process, 'where the results might well settle the accused's fate and reduce the trial itself to a mere formality.' " *Moulton,* 474 U.S. at 170, 106 S.Ct. at 484 (*quoting United States v. Wade,* 388 U.S. 218, 224, 87 S.Ct. 1926, 1930, 18 L.Ed.2d 1149 (1967)). "Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at the least that a person is entitled to the help of a lawyer at or after the time that judicial

proceedings have been initiated against him...." *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) (*quoted in Moulton,* 474 U.S. at 170, 106 S.Ct. at 484).[10] *See Lovett v. State,* Del.Supr., 516 A.2d 455, 462 (1986), *cert. denied,* 481 U.S. 1018, 107 S.Ct. 1898, 95 L.Ed.2d 504 (1987); *Deputy v. State,* Del. Supr., 500 A.2d 581, 589–90 (1985), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1589, 94 L.Ed.2d 778 (1987).

 Once it has attached, the Sixth Amendment right to counsel prohibits the government (acting through an agent) from deliberately eliciting incriminating statements from a defendant in the absence of his counsel. *Moulton,* 474 U.S. at 176, 106 S.Ct. at 487; *United States v. Henry,* 447 U.S. 264, 270, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). It does not, however, prohibit an informant, either through prior arrangement or voluntarily, from reporting incriminating statements to the police. "Rather, the defendant must demonstrate that the police and their informant took some action, beyond mere listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986). *See Moulton,* 474 U.S. at 176, 106 S.Ct. at 487. Statements taken in violation of the right to counsel are inadmissible at trial, *e.g. id.* at 180, 106 S.Ct. at 489, and at capital sentencing hearings, *see Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Thus, the questions posed here are as follows: (1) Did Jackson's right to counsel attach? (2) If so, was Talmo a state agent? (3) If a state agent, did Talmo deliberately elicit incriminating statements from Jackson? *See United States v. Johnson,* 10th Cir., 4 F.3d 904, 910 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1082, 127 L.Ed.2d 398 (1994); *Thomas v. Cox,* 4th Cir., 708 F.2d 132, 136,

---

**10.** The reasoning was well explained by the Supreme Court in *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972):

The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of an organized society, and immersed in the intricacies of substantive and procedural criminal law.

*cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983).

## C.

The State strenuously argues that there was no Sixth Amendment violation since Jackson's right to counsel had not attached with respect to the plot to kill Burton. Observing that the Supreme Court has held that the Sixth Amendment right to counsel is "offense-specific," *McNeil v. Wisconsin,* 501 U.S. 171, 174, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991), the State argues that Jackson's right to counsel was linked to the crimes connected to the Girardi murder, but not the Burton murder plot. Therefore, the State contends, the taped statements, involving the Burton murder plot, were not obtained in violation of Jackson's right to counsel because the right had not attached as to that offense.

In *McNeil,* the petitioner was imprisoned for a crime that had been committed in West Allis, Wisconsin. After being advised of his *Miranda* rights, McNeil refused to answer questions. While still imprisoned, he later waived his *Miranda* rights and was questioned about his knowledge of other, unrelated crimes that had occurred in the town of Caledonia. He eventually made statements incriminating himself in the Caledonia crimes and was then formally charged with those crimes and subsequently convicted. He argued that his statements regarding the Caledonia crimes should have been suppressed because he had already invoked his *Fifth Amendment* right to counsel with respect to the West Allis crime by appearing in court with an attorney. *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The *Sixth Amendment* right to counsel was not implicated in *McNeil.* Nonetheless, in *dicta,* the Supreme Court observed that the Sixth Amendment right is "offense-specific." That is, "[i]t cannot be invoked once for all future prosecutions, for it does not

attach until a prosecution is commenced...." 501 U.S. at 174, 111 S.Ct. at 2207. The State's argument here is premised on the "offense-specific" comment in *McNeil.*

The flaw in the State's argument is that the incriminating statements obtained from Jackson were, in fact, used against him during the sentencing phase of the Girardi murder trial, for which crimes Jackson's right to counsel had plainly attached. *Moulton* would permit such statements to be used at a trial for charges stemming from the Burton murder plot, but we do not read it as permitting the use of the statements at the sentencing hearing for the Girardi murder. 474 U.S. at 180 n. 16, 106 S.Ct. at 489 n. 16 ("Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of *those offenses.*") (*quoted in McNeil,* 501 U.S. at 176, 111 S.Ct. at 2208) (emphasis added).

The evidentiary value of the Talmo taped statements was two-fold: (1) they had independent significance as evidence of a new crime (the plot to murder Burton); (2) they were evidence of Jackson's future dangerousness, a relevant consideration of the sentencer in the pending matter. While there is no Sixth Amendment impediment to using the statements in a prosecution for the former, the Sixth Amendment prohibits the admission of "incriminating statements pertaining to pending charges ... [notwithstanding] the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to counsel." *Moulton,* 474 U.S. at 180, 106 S.Ct. at 489.

We recognize the obvious need for the police to investigate Jackson's attempts to have Burton killed.[11] The police have a legitimate interest in investigating new or additional crimes, which may require surveillance of individuals already under indictment. *Moulton,* 474 U.S. at 179, 106 S.Ct. at 489. We simply hold that incriminating state-

---

11. We express reservations about the propriety of tape recording conversations involving a defendant and an undercover state agent while trial is in progress. There is a risk that sensitive

matters, including trial strategy, may be discussed in such conversations. Nonetheless, we recognize the extraordinary circumstances facing the police in this situation.

ments deliberately elicited by a state agent under these circumstances could not constitutionally be used against Jackson during the sentencing hearing for the Girardi murder. *Moulton*, 474 U.S. at 179–81, 106 S.Ct. at 489–90; *Massiah*, 377 U.S. at 207, 84 S.Ct. at 1203.

Our conclusion that Jackson's Sixth Amendment right to counsel with respect to the Girardi murder prohibited the introduction into evidence of incriminating statements deliberately elicited by a state agent is in accord with the decision of the Supreme Court of Illinois in *People v. Kidd*, Ill.Supr., 129 Ill.2d 432, 136 Ill.Dec. 18, 544 N.E.2d 704 (1989). There, the defendant had been arraigned for his role in the murder of four people and a related arson that occurred in 1984. He was later interrogated by police, in the absence of his counsel, about his role in a 1980 fire in which 10 children died, and admitted setting the 1980 fire. He pleaded guilty to nine counts of murder and various other charges arising out of the 1984 arson murders. During his sentencing hearing, the prosecution presented testimony regarding the defendant's role in the 1980 fire. The defendant was ultimately sentenced to death.

On appeal, the Supreme Court of Illinois vacated the defendant's guilty pleas and resulting death sentences on the ground that the pleas were not made knowingly and intelligently. However, the court went on to address the defendant's claim that the testimony involving the 1980 fire elicited at the sentencing hearing for the 1984 arson murders violated his Sixth Amendment right to counsel. After an extensive discussion of *Moulton*, the Supreme Court of Illinois rejected the same argument made by the State here and held as follows:

> Because we believe that a pretrial interrogation by the State used to garner evidence later used at a death penalty hearing is a critical stage in the proceedings (*see Estelle v. Smith* [451 U.S. at 469–71, 101 S.Ct. at 1876–77]), and a State agent, in the case at bar, deliberately elicited incriminating statements, used to support the State's case that defendant was deserving of the death penalty, deliberately in the absence of defendant's counsel, we find the

defendant's sixth amendment right to counsel was violated. [*Moulton*, 474 U.S. at 180, 106 S.Ct. at 489].

544 N.E.2d at 712. We find *People v. Kidd* to be directly on point and agree with the analysis and conclusion of the Supreme Court of Illinois.

Given the opportunity to do so in supplemental briefing following oral argument, the State does not attempt to distinguish *People v. Kidd*, but instead claims its analysis of *Moulton* is somehow undermined by the United States Supreme Court's subsequent statement in *McNeil* that the Sixth Amendment right to counsel is "offense-specific." In support of this contention, the State relies heavily on *United States v. Kidd*, 4th Cir., 12 F.3d 30 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1629, 128 L.Ed.2d 352 (1994). There, the defendant had been indicted and counsel appointed for charges stemming from the possession and distribution of cocaine base. While on release pending trial, he engaged in another drug transaction with an undercover police informant. That later transaction led the government to obtain a superseding indictment including the later transaction as a separate count and extending the conspiracy period. Pursuant to a plea agreement, the defendant pleaded guilty to one of the earlier charges and the government moved to dismiss the remaining counts, including that related to the later drug transaction.

At sentencing, the defendant objected to references in the presentence report relating to the later drug transaction on Sixth Amendment grounds, specifically to the calculation of the weight of cocaine sold, which was relevant for the determination of his sentence under the United States Federal Sentencing Guidelines. The district court overruled the objection and, on appeal, the Fourth Circuit affirmed, finding no Sixth Amendment violation. Relying on the "offense-specific" characterization of *McNeil*, the Fourth Circuit held that the defendant's right to counsel had not attached as to the later offense and upheld the use of that crime

for sentencing purposes.[12]

We find *United States v. Kidd* unpersuasive. Although the court determined there was no Sixth Amendment violation with respect to obtaining evidence regarding further crimes, the court did not address how the evidence of the later offense could constitutionally be used to enhance the sentence for the initial offense. In any event, we find a ruling rendered in the context of the Sentencing Guidelines for a drug offense to be of limited assistance in death penalty jurisprudence.

Death is different. *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion). "[D]eath as a punishment is unique in its severity and irrevocability." *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976) (plurality opinion); *Pennell v. State,* Del.Supr., 604 A.2d 1368, 1375 (1992). Therefore, "the Eighth Amendment requires increased reliability of the process by which capital punishment may be imposed." *Herrera v. Collins,* — U.S. —, —, 113 S.Ct. 853, 863, 122 L.Ed.2d 203 (1993). Given these considerations, we decline to follow *United States v. Kidd,* finding *People v. Kidd* to represent a proper application of Sixth Amendment principles in an Eighth Amendment context.[13]

### D.

The next issue we must resolve is whether Talmo was a state agent in his contacts with Jackson, and if so, whether he deliberately elicited incriminating statements from Jack-

son. In doing so, we divide Talmo's actions into three time periods: (1) prior to his initial contact with McClaren; (2) the recording of Jackson's telephone conversations; and (3) the times in between. Jackson claims Talmo was a state agent at all relevant times. The State argues he was never its agent. The parties also disagree as to whether Talmo deliberately elicited incriminating statements from Jackson.

### 1

"State agent" for Sixth Amendment purposes defies easy definition. The Supreme Court's major Sixth Amendment right to counsel opinions, *Massiah, Brewer, Henry, Moulton,* and *Kuhlmann,* do not define the term, focusing instead on the method of gathering information. *See Massiah,* 377 U.S. at 206, 84 S.Ct. at 1203 ("deliberately elicited"); *Brewer,* 430 U.S. at 399, 97 S.Ct. at 1240 ("set out to elicit"); *Henry,* 447 U.S. at 270, 100 S.Ct. at 2186 ("deliberately elicited"); *Moulton,* 474 U.S. at 176, 106 S.Ct. at 487 ("knowingly circumventing" right to counsel); *Kuhlmann,* 477 U.S. at 459, 106 S.Ct. at 2630 ("designed deliberately to elicit"). The information gatherer was simply assumed to be a state agent. *See Brewer,* 430 U.S. at 387, 97 S.Ct. at 1232 (police officers); *Henry,* 447 U.S. at 270, 100 S.Ct. at 2186 (informant paid on a "contingent-fee basis"); *Moulton,* 474 U.S. at 163, 106 S.Ct. at 480 (informant offered a deal for cooperation); *Kuhlmann,* 477 U.S. at 475, 106 S.Ct. at 2638 (Brennan, J., dissenting) (informant usually received consideration for services rendered to police). *See also Thomas v. Cox,* 4th Cir., 708 F.2d

---

**12.** The Fourth Circuit also relied upon *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), as did the State at trial and on appeal here. There, the Supreme Court held that an undercover informant posing as a fellow inmate need not give the *Miranda* warnings to an inmate before interrogating him about activities unrelated to his present incarceration. *Perkins* clearly rests on Fifth Amendment grounds. The Court observed, in its only mention of the Sixth Amendment, that "no charges had been filed on the subject of the interrogation, and our Sixth Amendment precedents [*Massiah, Henry,* and *Moulton* ] are not applicable." 496 U.S. at 299, 110 S.Ct. at 2398. We cannot read that brief passage from a Fifth Amendment case as permitting the use of the taped statements during the proceedings in the same case for which the right

to counsel had attached in light of the Sixth Amendment challenge presented here.

**13.** Similarly, we find the State's reliance on the Supreme Court's recent decision in *Nichols v. United States,* — U.S. —, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) unavailing. There, the Supreme Court, overruling *Baldasar v. Illinois,* 446 U.S. 222, 100 S.Ct. 1585, 64 L.Ed.2d 169 (1980), held that there was no Sixth Amendment bar to using the defendant's prior uncounseled misdemeanor conviction in determining the appropriate sentence for a subsequent offense. *Nichols* cannot fairly be read as permitting evidence obtained under these circumstances to be used in a capital sentencing hearing.

132, 135 n. 2, *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983) (discussing fact that state agent aspect has never been a focal point of Supreme Court decisions on the issue).

■ The facts of *Massiah,* however, are closely analogous to those presented here with respect to the taped conversations. In *Massiah,* the informant, Colson, was a codefendant who agreed to cooperate with the government. Neither the Supreme Court's opinion nor that of the Court of Appeals, 2d Cir., 307 F.2d 62 (1962), indicates any reason for Colson's desire to cooperate and neither indicates he was promised anything in return. He then permitted a federal agent to install a radio transmitter in his automobile by which the agent could overhear conversations in the car. Here, Talmo was a trusted friend of Jackson who agreed to cooperate with the police. The reason for his desire to cooperate is unclear, though both Talmo and McClaren emphatically denied that he was promised anything in return. McClaren then provided Talmo with the recording equipment, presumably instructing him in its use, and asked him to tape his conversations with Jackson. Talmo did so and turned the tapes over to McClaren.

Given these facts, and their similarity to those in *Massiah,* we conclude Talmo was acting as a state agent when he recorded his telephone conversations with Jackson.[14] *Cf. United States v. Taylor,* 10th Cir., 800 F.2d 1012, 1016 (1986), *cert. denied,* 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987) (no agency when no agreement with, and in the absence of instructions or directions by, government). We likewise conclude, as detailed above, *supra,* p. 1370, that Talmo deliberately elicited incriminating statements from Jackson about the plot to kill Burton. This is not a case where the police obtained the taped statements through "luck or happenstance" or simply by listening. *See Kuhlmann,* 477 U.S. at 459, 106 S.Ct. at 2630; *Moulton,* 474 U.S. at 176, 106 S.Ct. at 487. To the contrary, here the statements were

obtained in very surreptitious fashion; Talmo, a trusted friend of Jackson, was cooperating with the police and agreed to secretly record their telephone conversations.

This technique is precisely what the Supreme Court has characterized as "the primary concern of the *Massiah* line of decisions"—"secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann,* 477 U.S. at 459, 106 S.Ct. at 2630. *See also Moulton,* 474 U.S. at 175–76, 106 S.Ct. at 486–87; *Massiah,* 377 U.S. at 206, 84 S.Ct. at 1203. Indeed, conversations with secret informants pose a greater imposition upon a defendant than overt police interrogation because the defendant does not know he is being interrogated by a government agent. *Id.* The fact that Jackson initiated the telephone calls to Talmo is of no consequence. *Moulton,* 474 U.S. at 174–75, 106 S.Ct. at 486. What is determinative is Talmo's deliberate eliciting of incriminating statements from Jackson, "knowingly circumventing [Jackson's] right to have counsel present in a confrontation between [him] and a state agent." *Id.* at 176, 106 S.Ct. at 487.

2

■ While the record establishes that Talmo was a state agent at the time of the taped telephone conversations, it does not support Jackson's claim that Talmo was a state agent when he began taking notes of his conversations with Jackson while still imprisoned. When Talmo began taking notes in prison, he was acting on his own and the police were completely unaware of his actions. Regardless of his motive, Talmo cannot be said to have been an agent of the State at that time. *United States v. Johnson,* 10th Cir., 4 F.3d 904, 912 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1082, 127 L.Ed.2d 398 (1994); *Taylor,* 800 F.2d at 1016; *Thomas,* 708 F.2d at 135–36; *State v. Pettingill,* Me.Supr., 611 A.2d 88, 90 (1992). Since Talmo was not a state agent, Jackson's Sixth Amendment right to counsel was not violated, regardless of whether the incrimina-

---

**14.** The facts of *Moulton* are similar, except in the agency aspect, in that the police provided the informant, also named Colson, with a recording device to record telephone calls from the defen-

dant, which he did. 474 U.S. at 163, 106 S.Ct. at 480. The police and Colson had already agreed on a deal to secure Colson's cooperation. *Id.*

ting statements were deliberately elicited. *Taylor,* 800 F.2d at 1015.

### 3

The record establishes that Talmo was not a state agent at the time he began taking notes on September 8, 1992, and that he was a state agent at the time of the taped telephone conversations in March 1993. However, it is unclear as to whether Talmo was a state agent at the time he received from Jackson the letter and map to Burton's residence, either in September 1992 or in February 1993. The record, as developed in limited fashion at the sentencing hearing, does not support Jackson's claim that Talmo was a state agent during this time period. If he was a state agent at the relevant time, it is likewise unclear whether he "deliberately elicited" incriminating statements, including the letter and map, from Jackson. These points were not developed during the sentencing hearing, presumably because the trial judge held that all of the evidence secured by Talmo was admissible.

 Given our disposition as to the taped recorded statements, Jackson will have the opportunity to develop the record to support his claim that Talmo was a state agent who deliberately elicited the incriminating evidence obtained during the time period between his initial contact with McClaren and the recording of the telephone conversations. To guide the trial court in its handling of this issue, we observe the following. There is no bright-line test for determining whether an individual is a government agent for Sixth Amendment purposes. *Taylor,* 800 F.2d at 1015; *Thomas,* 708 F.2d at 136. A police informant is not necessarily a state agent. *Johnson,* 4 F.3d at 912; *Thomas,* 708 F.2d at 136–37. Factors to be considered are whether there was an agreement between the informant and the police, the content and scope of any such agreement, whether the police provided direction or instructions to the informant, and whether there was prearranged or ongoing cooperation. *See Johnson,* 4 F.3d at 911–12; *Taylor,* 800 F.2d at 1015–16; *Thomas,* 708 F.2d at 135–37. *See generally, Henry,* 447 U.S. at 270–73, 100 S.Ct. at 2186–88.

In sum, we hold that there is no Sixth Amendment bar to testimony and evidence regarding Jackson's contacts with Talmo to arrange for Burton's murder which preceded Talmo's initial contact with McClaren on September 21. However, with respect to the taped telephone conversations, we hold that the State, acting through its agent, Talmo, deliberately elicited incriminating statements from Jackson, "knowingly circumventing [Jackson's] right to have counsel present in a *confrontation between [him] and a state agent." Moulton,* 474 U.S. at 176, 106 S.Ct. at 487. Jackson's Sixth Amendment right to counsel was violated by the introduction into evidence at his sentencing hearing of the taped telephone conversations, along with references to them in testimony and the remarks of the prosecutor during argument. Additionally, it was constitutionally improper for the trial judge to consider the content of *those conversations in his determination that the murder plot constituted a non-statutory aggravating circumstance.*

### E.

 The State asserts that any constitutional error with respect to the admission of the taped statements was harmless beyond a reasonable doubt, and therefore Jackson's death sentences should nonetheless be affirmed. *See Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (Sixth Amendment violations are subject to harmless error analysis, even when such violations occur in the sentencing phase of a capital case.). The State observes that evidence of the Burton murder plot was already before the jury and judge by virtue of Johnson's testimony regarding Jackson's efforts to solicit his participation in the crime. Moreover, Jackson's initial efforts to involve Talmo in the plot were properly admitted into evidence. Therefore, the State concludes, the taped conversations were merely cumulative and did not contribute to the decision to impose the death sentences.

The State bears the burden of demonstrating that the error committed here was harmless beyond a reasonable doubt. *Dawson v. State,* Del.Supr., 608 A.2d 1201, 1204 (1992) (citing *Chapman v. California,* 386 U.S. 18,

24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). The test is

> not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."

*Satterwhite*, 486 U.S. 249, 258–59, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (*quoting Chapman*, 386 U.S. at 24, 87 S.Ct. at 828). *See Dawson*, 608 A.2d at 1204.

While the taped conversations were no doubt cumulative, they were buttressing as well. Given the fact that the only testimony as to the murder plot came from Johnson and Talmo, both convicted felons, it is uncertain whether the jury or judge would have believed the startling assertion that Jackson was attempting to orchestrate from prison the murder of a key State's witness. Therefore, the taped statements played an important evidentiary role in corroborating the testimony of Johnson and Talmo through Jackson's own words.

Moreover, during closing arguments, the prosecutor emphasized the taped conversations, telling the jury they could review the transcripts and listen to the tapes, and urging them to consider the murder plot as an aggravating factor. The trial judge considered the murder plot to be the first non-statutory aggravating circumstance, and specifically referred to the admission into evidence of the tapes. Finally, in determining that the aggravating circumstances outweighed the mitigating circumstances, the judge observed that Jackson's criminal history "has continued up until the commencement of his trial," an obvious reference to the fact that the taped conversations regarding the murder plot were obtained during the preliminary phases of the trial.

The United States Supreme Court has observed that "[a] defendant's confession is probably the most probative and damaging evidence that can be admitted against him.... [I]t is impossible to know what credit and weight the jury gave to the confession." *Arizona v. Fulminante*, 499 U.S. 279, 292, 111 S.Ct. 1246, 1255, 113 L.Ed.2d 302 (1991) (citations omitted). Recognizing the fact that the tapes feature Jackson, in his own voice, plotting the murder of a key witness and his hope to receive a plea bargain when the murder is accomplished, and given the heavy emphasis placed on the tapes during the sentencing process, we cannot conclude that the State has carried its burden of establishing that the Sixth Amendment violation in this case was harmless beyond a reasonable doubt. *Dawson*, 608 A.2d at 1204–05; *cf. Gattis v. State*, Del.Supr., 637 A.2d 808, 817 (1994). Accordingly, Jackson's death sentences are hereby vacated and a new sentencing hearing is required.[15]

\* \* \* \* \* \*

Having found reversible error with respect to Jackson's Sixth Amendment claim, we address Jackson's other claims of error to provide guidance to the trial court for Jackson's new sentencing hearing.

## IV

During the sentencing hearing, Jackson's mother and sister were called as defense witnesses. Although the matter was not raised on direct examination, on cross-examination both were asked by the prosecutor if Jackson had ever said he was sorry or shown remorse for killing Mrs. Girardi.[16] Jackson

---

**15.** In light of our disposition on the Sixth Amendment issue, we need not address Jackson's claim that the State violated the discovery obligations of Superior Court Criminal Rule 16. Since all of the information claimed to have been improperly withheld is now part of the record and in the possession of the defense, it will be available for use at Jackson's new sentencing hearing. Therefore Jackson will not be prejudiced by the alleged discovery violation. *See Ray v. State*, Del.Supr., 587 A.2d 439, 441 (1991). We nonetheless express our continuing concern with the State's conduct with respect to its discovery obligations. *See id.* at 442.

**16.** Jackson's sister testified as follows:
 Q: Did your brother ever tell you he was sorry for murdering Mrs. Girardi?
 A: No.
 Q: Would you agree with me that when you visit him at prison, those about six times over the course of a year, he's never shown any remorse for killing Mrs. Girardi?
 A: Bobby has never showed emotion.

then called Dr. Stephen Mechanick, a psychiatrist, as a witness. Dr. Mechanick was asked on direct examination if Jackson was incapable of expressing remorse. On cross-examination, he was questioned about Jackson's expression of remorse.

In his closing argument, the prosecutor spoke of Jackson's actions after the murder but before his arrest and repeatedly emphasized his lack of remorse. (*E.g.,* "Is that a · remorseful man? Is that somebody who is sorry for killing Mrs. Girardi? No. He has shown absolutely no remorse.") The trial judge, in his sentencing decision, considered Jackson's lack of expression of sympathy or remorse, coupled with his statements to the effect that he "always wanted to know what it would be like to kill someone" to be a nonstatutory aggravating circumstance. In so doing, the trial judge referred to Jackson's failure to testify at trial and the sentencing hearing.[17]

Jackson claims that the prosecutor's questioning of several defense witnesses regarding his lack of remorse violated his Fifth Amendment privilege against self-incrimination. Jackson did not object when the testimony was elicited, but subsequently (just prior to closing arguments) moved for a mistrial. The trial judge denied the mistrial motion as untimely, but instructed the State not to mention any post-arrest silence or lack of remorse during closing argument. Jackson argues that the denial of the mistrial was

error. However, he does not challenge the prosecutor's remarks regarding his lack of remorse in closing arguments, nor does he assert error with respect to the trial judge's comment upon his failure to testify in the court's discussion of Jackson's lack of remorse in its sentencing decision. Given the fact that a new sentencing hearing is required, we address all of these issues for the guidance of the trial court in this and future cases.

### A.

The Fifth Amendment, as applicable to the States through the Fourteenth Amendment, provides that "No person ... shall be compelled in any criminal case to be a witness against himself...."

The Fifth Amendment protects the individual's right to remain silent. The central purpose of the privilege against compulsory self-incrimination is to avoid unfair criminal trials. It is an expression of our conviction that the defendant in a criminal case must be presumed innocent, and that the State has the burden of proving guilt without resorting to an inquisition of the accused.

*Lefkowitz v. Cunningham,* 431 U.S. 801, 810, 97 S.Ct. 2132, 2138, 53 L.Ed.2d 1 (1977) (Stevens, J., dissenting) (footnote omitted). So fundamental is the Fifth Amendment privilege that prior to any custodial interrogation the accused must be advised of the

---

Jackson's mother testified as follows:
 Q: When you visited your son at prison, did he ever show any remorse to you for killing Mrs. Girardi?
 A: My son is very upset about everything that is happened [sic]. I don't know what you mean by remorse. He has told me he is very upset for everyone involved in everything and he feels bad that I have to go through this.
 . . . .
 Q: Did he ever say he was sorry for killing Mrs. Girardi to you?
 A: I didn't bring it up to him.
 Q: Did—
 A: It's too painful.
 Q: Did he ever volunteer to you?
 A: He wouldn't bring anything up to me that he thought was painful for me because I've been through enough.

**17.** The relevant portion of the sentencing decision is as follows:

The State offered testimony concerning statements made by the defendant to his friends that he "always wanted to be a hit man" and "always wanted to know what it would be like to kill someone." These statements coupled with defendant's lack of expression or any sympathy or remorse is [sic] an aggravating factor. Defendant did not testify at the guilt/innocence trial or at the penalty hearing. Also, defendant did not exercise his right to speak to the jury at the conclusion of the evidence at the penalty hearing. When he chose to speak at the argument hearing concerning punishment, he only expressed sorrow for his family and friends. Lachette further testified at the penalty hearing that defendant treated this homicide as an inside joke prior to arrest.

The Court finds, by credible and reliable evidence, that the lack of remorse is an aggravating factor in light of the overwhelming evidence of defendant's guilt.

right to remain silent if his statements are to be used against him at trial. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Fifth Amendment privilege applies both at trial and during a capital sentencing hearing. *Estelle v. Smith*, 451 U.S. 454, 462–63, 101 S.Ct. 1866, 1872–73, 68 L.Ed.2d 359 (1981).

█ A person cannot be penalized for exercising his Fifth Amendment privilege. *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). In *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965), the Supreme Court held that the privilege against self-incrimination granted by the Fifth and Fourteenth Amendments "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *See, e.g., Benson v. State*, Del.Supr., 636 A.2d 907, 910 (1994); *DeShields v. State*, Del.Supr., 534 A.2d 630, 641 (1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 217 (1988). Moreover, the Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the prosecution from commenting upon an accused's exercise of his right to remain silent following the receipt of his *Miranda* warnings. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). *See Hughes v. State*, Del.Supr., 437 A.2d 559, 573–74 (1981).

### B.

Relying on *Griffin*, *Doyle*, and their progeny, Jackson argues that questioning about his lack of remorse violated his Fifth Amendment rights since, in order to express remorse, he would have to waive his right to remain silent. Therefore, he argues, he was penalized for exercising his right to remain silent by the questioning regarding his lack of remorse. *See Lesko v. Lehman*, 3d Cir., 925 F.2d 1527, 1540–45, *cert. denied*, —— U.S. ——, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991).

█ While we have never addressed this specific issue,[18] courts in other jurisdictions permit a defendant's lack of remorse to be considered in fixing sentence. *See, e.g., United States v. Johnson*, 7th Cir., 903 F.2d 1084, 1090 (1990); *United States v. Bangert*, 8th Cir., 645 F.2d 1297, 1308–09, *cert. denied*, 454 U.S. 860, 102 S.Ct. 314, 70 L.Ed.2d 158 (1981); *People v. Albanese*, Ill.Supr., 102 Ill.2d 54, 79 Ill.Dec. 608, 622, 464 N.E.2d 206, 219, *cert. denied*, 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 205 (1984). Presumably, the theoretical basis for considering such evidence is that it may be reflective of a defendant's character and propensities, both proper sentencing considerations. While we recognize the relevance of such considerations in the abstract, *see Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Pennell v. State*, Del.Supr., 604 A.2d 1368, 1376 (1992), we nonetheless believe that Fifth Amendment concerns are raised by direct questioning and prosecutorial comment about remorse, since the only affirmative way for a defendant to express remorse is to waive his right to remain silent. *See Lesko*, 925 F.2d at 1544–45; *People v. Coleman*, Cal.Supr., 71 Cal.2d 1159, 80 Cal.Rptr. 920, 926, 459 P.2d 248, 254 (1969). Indeed, a true expression of remorse requires the ultimate form of self-incrimination—an admission of guilt.

The questioning of the three witnesses on the element of remorse was brief, did not draw a timely objection, and cannot be fairly read as having undermined the fundamental fairness of the proceeding. *See People v. Hovey*, Cal.Supr., 44 Cal.3d 543, 244 Cal.Rptr. 121, 144, 749 P.2d 776, 797, *cert. denied*, 488 U.S. 871, 109 S.Ct. 188, 102 L.Ed.2d 157 (1988); *Henderson v. Dugger*, 11th Cir., 925 F.2d 1309, 1318 (1991). Moreover, with respect to Dr. Mechanick's testimony, Jackson raised the remorse issue during direct examination and cannot complain about the limited cross-examination he invited. *People v. Clark*, Cal.Supr., 5 Cal.4th 950, 22 Cal.Rptr.2d 689, 731, 857 P.2d 1099, 1141 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2783, 129 L.Ed.2d 894 (1994). *See also Bromwell v. State*, Del.Supr., 427 A.2d 884, 892 (1981). Given these circumstances, we are not inclined to view the refusal to grant a

---

18. We considered a related issue in *Hughes v. State*, Del.Supr., 437 A.2d 559, 572 (1981), where we held the prosecutor's comments about the defendant's demeanor to be improper. That decision, however, was not grounded on the Fifth Amendment.

mistrial as an abuse of discretion. Any error in this regard was harmless beyond a reasonable doubt. *Williams v. Chrans,* 7th Cir., 945 F.2d 926, 953–54 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992); *Hovey,* 749 P.2d at 797. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Nonetheless, we consider improper any effort to focus upon lack of remorse in a manner which infringes upon the defendant's right not to testify. We express our concern over the line of questioning in this case, the prosecutor's comments during closing argument, and the trial judge's consideration of Jackson's lack of remorse in conjunction with a non-statutory aggravating circumstance.

Other courts have also expressed concern over such matters. The Court of Criminal Appeals of Texas has held that "[t]estimony as to contrition or remorse can only come from the accused, and when offered by witnesses other than the accused himself is inadmissible." *Swallow v. State,* Tex.Cr.App., 829 S.W.2d 223, 225 (1992). Similarly, the Supreme Court of South Carolina has repeatedly found prosecutorial remarks concerning remorse to be reversible error. *See State v. Cockerham,* S.C.Supr., 294 S.C. 380, 365 S.E.2d 22, 23 (1988) (collecting cases) ("look at [appellant], does he look sorry to you?" and "Have you seen any remorse?"). *See also Lesko,* 925 F.2d at 1544–45 (defendant didn't have the "common decency to say I'm sorry for what I did."); *Owen v. State,* Tex.Cr.App., 656 S.W.2d 458, 459 (1983) (defendant testified at trial but not sentencing hearing; prosecutor's remarks about defendant's failure to say he was sorry constituted reversible error); *People v. Ramirez,* Ill. Supr., 98 Ill.2d 439, 75 Ill.Dec. 241, 247, 457 N.E.2d 31, 37 (1983) ("[defendant] has sat silent before you, before his accusers and before the tryer [sic] of fact and offered no explanation for the murder").

Even courts which permit consideration of a lack of remorse note that there is a fine line between punishing a defendant for remaining silent and proper consideration of his failure to show remorse. *See United States v. Johnson,* 7th Cir., 903 F.2d 1084, 1090 (1990). Given Jackson's failure to challenge the prosecutorial remarks and the consideration of the non-statutory aggravating circumstance in the present appeal and our disposition of the Sixth Amendment issue, we are not required to determine whether error exists here. In another setting, questioning or argument regarding a defendant's lack of remorse or failure to express sorrow may constitute reversible error.[19]

### C.

■ As noted above, in his sentencing decision, the trial judge considered Jackson's lack of remorse, in conjunction with other things, to be a non-statutory aggravating circumstance. In so doing, the trial judge made reference to Jackson's failure to testify. *See, supra,* note 17. In addition to our concern over the propriety of such a non-statutory aggravating circumstance, and while Jackson again fails to claim error on appeal, we view the reference as raising additional Fifth Amendment concerns. As discussed above, a defendant may not be penalized for his failure to testify. *E.g., Minnesota v. Murphy,* 465 U.S. 420, 434, 104 S.Ct. 1136, 1146, 79 L.Ed.2d 409 (1984); *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). It follows that the sentencer may not infer a lack of remorse from the defendant's failure to testify. *See People v. Coleman,* Cal.Supr., 71 Cal.2d 1159, 80 Cal.Rptr. 920, 926, 459 P.2d 248, 254 (1969) (failure to confess cannot be deemed evidence of lack of remorse). Given that we are vacating Jackson's death sentences on other grounds, we need not determine if such an inference was drawn. We do, however, caution against

---

19. The fact that a defendant is remorseful is a mitigating factor to be considered by the jury and judge. *See, e.g., Gattis v. State,* Del.Supr., 637 A.2d 808, 822 (1994). Indeed, "the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death." *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (citation and internal quotation marks omitted) (emphasis in original).

such considerations in sentencing determinations.

## V

■ Jackson claims the trial court erred by failing to prescribe the standard of proof necessary to the finding of non-statutory aggravating circumstances in its jury instructions during the sentencing phase. Moreover, Jackson argues that the trial court itself applied an erroneous standard of "credible and reliable evidence" in its sentencing decision. Jackson's claim is controlled by our recent decision in *Dawson v. State*, 637 A.2d 57, 62–64 (1994), in which we rejected an identical argument with respect to jury instructions and held that the Delaware death penalty statute does not require proof of a *non-statutory* aggravating circumstance beyond a reasonable doubt before it may be "found to exist." *Accord, Lawrie v. State*, Del.Supr., 643 A.2d 1336, 1341–1342 (1994). We likewise find no error in the trial court's "credible and reliable evidence" formulation of the standard of proof, which is consistent with our ruling in *Dawson.*[20]

## VI

■ Jackson's final claim of error is that the imposition of a death sentence for felony murder offends the Eighth and Fourteenth Amendments because Delaware's death penalty statute does not sufficiently narrow the group of death-eligible defendants charged with homicide. *See Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). Jackson contends that use of the statutory aggravating circumstance that he was engaged in the commission of a robbery and burglary with respect to his conviction for felony murder was improper. 11 *Del.C.* §§ 636(a)(2), 4209(e)(1)j. Jackson claims that, because the statutory aggravating circumstance of robbery/burglary essentially duplicates an element of the capital offense, felony murder, the requisite narrowing did not occur.

Jackson's argument is foreclosed by our recent decision in *Ferguson v. State*, Del. Supr., 642 A.2d 772, 780–781 (1994), in which we adhered to our earlier decisions in *Whalen v. State*, Del.Supr., 492 A.2d 552, 565–69 (1985) and *Riley v. State*, 496 A.2d 997, 1021 (1985), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986) and rejected an identical claim. *Accord Deputy v. Taylor*, 3d Cir., 19 F.3d 1485, 1500–02, *cert. denied*, —— U.S. ——, 114 S.Ct. 2730, 129 L.Ed.2d 853 (1994).

## VII

Jackson claims that his death sentences are disproportionate to the sentences imposed in similar cases. Such a claim relates to this Court's mandatory review of all death sentences, which requires that we determine whether the sentence imposed is "disproportionate to the penalty recommended and imposed in similar cases." 11 *Del.C.* § 4209(g)(2)(a). Given the fact that we have vacated Jackson's death sentences on Sixth Amendment grounds, we consider it improvident to conduct our mandatory review and therefore decline to consider Jackson's proportionality argument.

## VIII

We have considered all of Jackson's claims with respect to the guilt/innocence phase of his trial and find them to be without merit. Accordingly his convictions, including those for Murder First Degree, are AFFIRMED. We conclude that Jackson's Sixth Amendment right to counsel was violated by the introduction into evidence of the taped incriminating statements deliberately elicited by a state agent during the sentencing hearing and that the State has not carried its burden of establishing that such error was harmless beyond a reasonable doubt. Accordingly, Jackson's death sentences are VACATED and the matter is REMANDED for a new penalty hearing to be conducted consistent with this opinion.

---

20. Given our disposition on the Sixth Amendment issue, we need not consider the effect of the United States Supreme Court's recent decision in *Simmons v. South Carolina*, —— U.S. ——, 114

S.Ct. 2187, 129 L.Ed.2d 133 (1994) regarding a defendant's due process right, in certain circumstances, to a jury instruction that he is ineligible for parole.

The parties shall have until 12 noon on July 20, 1994, to file motions for reargument.[21]

---

**21.** The time for reargument has been abbreviated due to the expiration of the term of Justice Andrew G.T. Moore, II. *See* Supr.Ct.R. 18. *Accord, Pennell,* 604 A.2d at 1378 n. 8.